STATE OF NEBRASKA, PLAINTIFF IN ERROR, V. JAMES SNEFF, DEFENDANT IN ERROR.

1. **Criminal Law :** BURGLARY. Where the proprietor of a building hears of an intended burglary to be committed by breaking into such building, and does not prevent it, but puts a force in the building to capture the burglar, and does effect his capture, this does not affect the guilt of the burglar.

2. ———: EVIDENCE OF ACCOMPLICE. A person to whom one intending to commit burglary confides such intention, and procures such person to promise to act as accomplice, is a competent witness to prove the declarations and acts of the party committing the offense, the credibility of such witness being a question for the jury.

3. ———: DIRECTING VERDICT. Where there is testimony from which the jury would be warranted in finding that a person indicted for burglary committed the offense, it is error for the court to direct the jury to acquit.

31

EXCEPTIONS filed by county attorney of Richardson county (BROADY, J., presiding), under the provision of sections 515 *et seq.*, of the criminal code.

*E. W. Thomas* and *Edwin Falloon* (county attorney), for the state.

No appearance contra.

MAXWELL, CH. J.

The defendant was indicted by the grand jury of Richardson county for the crime of burglary, by breaking into the B. & M. railroad station at Humboldt. On the trial of the cause the court instructed the jury as follows :

"Gentlemen of the jury—You are directed to return a verdict of acquittal in this cause, for the reason that the evidence is too clear that this man Bayliss was under the direction of the railroad company's agent, when he was pretending to be in collusion with this defendant, and going with him to commit this crime. He was under their direction to further the perpetration of the act, and present giving encouragement at the time it was done, which in law, I think, shows a consent on the part of the owner of the property. And there is not enough evidence to the contrary to submit the question of fact to the jury. The law being, if the owner of the property consent, it is not a crime for which he can put a party in the penitentiary. To make it a crime, the act must be without the consent of the owner.

"Such methods are very useful, and generally used for ferreting out past offenses, but cannot be used in this way. They may be used for the purpose of aiding in investigating and ascertaining the perpetrator of past offenses, but are not useful for the purpose of making new offenses, or the punishment of new offenses, for the policy of the law is to

stop crime, and not to permit one to commit a crime when he otherwise would not do it."

The district attorney excepted to the instruction. The jury rendered a verdict of acquittal, and the defendant was discharged.

The prosecuting attorney, for the purpose of settling the law, brings the cause into this court on error.

One James Bayliss, called as a witness by the state, testified :

Q.  Do you know the defendant, James Sneff?

A.  I saw him once or twice, I believe.

Q.  How long have you known him ?

A.  Well, since last fall ; I cannot just state the time.

Q.  Ever since last fall?

A.  Since he came to Humboldt, I don't just exactly know the month and day.

Q.  Were you in company with Sneff on the night of the 13th of November, 1886, in Humboldt, Nebraska?

A.  I cannot say about the date, but it was about that time.

Q.  What proposition did he make to you?

A.  He made a proposal that he would get into the depot and get some money, if I would watch for him.

Q.  About what time was that ?

A.  I could not swear to the day, I paid no attention to it.

Q.  Can you state the month ?

A.  No, sir ; I cannot tell.

Q.  Was it in 1886 ?

A.  Yes.

Q.  Was it in the fall?

A.  It was.

Q.  Was it in October or November ?

A.  I could not say for certain.

Q.  What proposition did he make to you ?  Tell all about it, and what he did.

A.   Well, the first time I ever spoke to the man, he walked up to me as I was standing on that corner of the depot, and he asked to borrow two dollars of me, and told me he could make two hundred out of it between that time and to-morrow ; I says, I have no money to loan, but if you are busted, and want work, I will tell you where you can get it.   I told him he could get work of Feayle, out in the country, shucking corn; he said he would not work ; he turned around and went into the depot, and I came back and walked along, and he was fumbling with the money box ; that was between 12 and 1 o'clock, day-time.

Q.   What other proposition did he make to you ?

A.   He made the proposal, if I would watch, he would get some money out of the money drawer in the station house at Humboldt.

Q.   In this county and state ?

A.   Yes.

Q.   What did you say to him ?

A.   I told him I was not in that kind of business.

Q.   Who did you communicate this information to ?

A.   As soon as he and I went up town, I came back and told Aiken, the station agent at Humboldt.

Q.   Then what did you do ?

A.   I went back up town, Aiken told me to aid and watch him, and if he wanted to do it to watch, and they would catch him in the act; and that between five and six, when the freight trains come down, he was to break in and I was out on the road watching for him, and he and some more men were in the station house watching for him, too. He said they didn't leave the waiting room door open as they had done and he would not break in.   So he came back, and we went up town, he went to town and I went home.

Q.   What time was that ?

A.   Between six and seven o'clock in the evening,

and I went over to a house in sight of the depot, and Cooper and some more men came over, and I says to them, I says, Cooper, I am going to let that fellow go; no, Cooper says, you go up town, and, if he comes around you again, let him go ahead. I went up town, and he came to me in a few minutes and spoke to me again, saying that he knew the agents were both gone.

Q. What did you do then?

A. I stayed around with him until some time the fore-part of the night, and we went to the depot together and he broke in.

Q. Did he raise the window, or did you?

A. He did; I didn't have my hands on the window.

Q. How was it fastened?

A. With a nail on the inside of the window.

Q. How did he raise it?

A. He raised it with a railroad spike.

Q. Then what did he do?

A. He went into the office.

Q. How was the window fastened with a nail?

A. I cannot say positively how it was fastened, but the window was nailed down and the nail was broken and laying on the outside.

Q. Where was it driven on the inside?

A. I don't know where it was driven, it looked as if it was driven into where the catch was.

Q. It fastened the lower sash down, did it?

A. Yes.

Q. Tell what Sneff did then?

A. He went in, and when he went in I went back to the corner, and then they came up on him, and he jumped out of the window and they took him.

Q. Did you make an examination of the station house after they caught Sneff?

A. Not until the next morning.

Q. Did you make an examination of everything he did in there?

A. I didn't see anything he did except where he tried to open one drawer. I don't know what was in it—a drawer where they kept something.

Q. Where was that?

A. In the station room.

Q. Whereabouts in the station room?

A. About the second box, I think, from the ticket window.

Q. A money drawer, was it?

A. I don't know what they kept in it.

Q. Was there any marks upon it?

A. Yes, there were marks of a spike, where he tried to pry it open.

Q. Did you ever talk to Sneff after the action was committed?

A. Yes.

Q. What did he tell you?

A. He said he believed it was a put-up job.

Q. What did he say he went in for?

A. For money, that was his purpose.

Q. What did he say afterwards?

A. He didn't say anything about it afterwards much.

Q. What time of night was this?

A. I think between 11 and 12, the forepart of the night.

The other testimony in the case tends to corroborate this, and there is no testimony to the contrary. So far as appears, there was no consent on the part of any one having charge of the station to the defendant breaking into the same. The fact that those in charge of a building hear of an intended burglary to be committed by breaking into the building, do not prevent it, but put a force in the building to capture the burglar, and he is so captured, does not affect the guilt of such burglar. *Thompson. v. State,* 18 Ind., 386.

Whatever may be thought of the course of the witness Bayliss, in professing to be a friend of the accused while

conspiring to betray him, and however despicable his conduct may appear, these matters merely affect his credibility before the jury. He is a competent witness to testify as to any matter that transpired between the accused and himself, provided such matter is competent. But the degree of reliance to be placed upon his testimony is a question for the jury.

In *State v. Jansen*, 22 Kan., 498, which is similar in some respects to the one under consideration, where an alleged detective assisted the accused to commit the offense, it was held that the question whether the proprietor consented to the entry of the defendant was for the jury to determine from the testimony in the case.

In our view the court should have submitted to the jury the question whether or not the railroad company consented to the defendant's entering the building in question, and erred in directing the jury to acquit the accused.

JUDGMENT ACCORDINGLY.

THE other judges concur.