STATE OF NEBRASKA, APPELLEE, V. MICHAEL W. RYAN, APPELLANT.
444 N.W.2d 610

Filed August 11, 1989.   No. 86-946.

Bruce Dalluge, of Morrissey, Morrissey & Dalluge, for appellant.

Robert M. Spire, Attorney General, A. Eugene Crump, and Melvin K. Kammerlohr for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

GRANT, J.

The defendant, Michael W. Ryan, was charged with first degree murder in the death of James Thimm. Thimm died April 29, 1985, after being tortured by defendant and four others for 3 days.

On September 25, 1985, an information was filed in the Richardson County District Court charging defendant with two counts of murder. Count I charged him with the first degree murder of James Thimm, and count II charged him with the first degree murder of Luke Stice. Count II of the information was separated in the trial and is not a part of this appeal, except as defendant's later plea of nolo contendere to second degree murder in that crime is addressed below in connection with defendant's sentencing.

On October 8, 1985, defendant appeared before the Richardson County District Court and entered a plea of not guilty to both counts at an arraignment hearing at which defendant was fully advised of his constitutional rights, including his right to remain silent and not testify or otherwise incriminate himself. On November 27, 1985, defendant filed a "Notice of Insanity Defense." On defendant's motion, the case was moved to Omaha, Douglas County, for trial. On February 24, 1986, the trial of count I of the information, the first degree murder of Thimm, commenced with jury selection. On March 6, 1986, a panel of 12 jurors and 2 alternate jurors was sworn. The trial began on March 10, 1986, and closing arguments were made on April 7, 1986.

On April 10, 1986, the jury returned its verdict finding defendant guilty of the first degree murder of James Thimm. Defendant moved for a three-judge sentencing panel pursuant to Neb. Rev. Stat. § 29-2520 (Reissue 1985). On May 6, 1986, this motion was denied. On April 18, 1986, a motion for a new trial was filed, and after a hearing was held on April 25, 1986, defendant's motion for a new trial was denied.

A sentencing hearing was held on September 15 and 16, 1986, before the trial judge. On October 16, 1986, defendant was

sentenced to death. This court is charged with the review of the Richardson County District Court's judgment, pursuant to Neb. Rev. Stat. § 29-2525 (Reissue 1985). In his brief, defendant has assigned 60 errors, which are grouped into 30 arguments. Each is discussed hereinafter. We affirm the judgment and the sentence.

During the trial, evidence was adduced that established the chronological order of events leading up to the torture death of Thimm. Evidence in the record as to the group's lifestyle and the events culminating in Thimm's murder are set out chronologically, and the defendant's arguments are considered separately below.

The record shows the following. Defendant was described as the leader of a group, characterized at trial as both a religious cult and a band of criminals, living on a farm outside of Rulo, in Richardson County, Nebraska. The cult largely developed out of the teachings of Rev. James Wickstrom, the self-proclaimed leader of a group which called itself the "Posse Comitatus." See *Williams v. State*, 253 Ark. 973, 490 S.W.2d 117 (1973). Defendant met Wickstrom at a Bible lecture in Hiawatha, Kansas.

Wickstrom's teachings centered around Anglo-Saxon supremacy, the unconstitutionality of income taxes, and the coming Battle of Armageddon. Although Ryan did not agree with all of Wickstrom's teachings, particularly with regard to tax matters, Wickstrom's ideology was the catalyst that formed the Rulo cult's belief system. As a result of his involvement with the Posse Comitatus, defendant met James Haverkamp, John David Andreas, Ora Richard (Rick) Stice, and James Thimm during 1982 and 1983. In June of 1983, Ryan and some of the other members of the group met with Wickstrom at a large meeting of the Posse Comitatus in Wisconsin.

During the Hiawatha meeting, Wickstrom showed Ryan what was known as the arm test. That test was described as follows. Defendant would face a group member, who would extend his right arm out at approximately a 90-degree angle from his or her body. Defendant would then place his left hand on the member's right shoulder and place his right hand on the member's right wrist. After asking Yahweh (the name used by

defendant and his group for God) a question, defendant would apply pressure to the person's right arm. If the arm dropped, the answer to the question being asked of Yahweh was "no"; if the person's arm stayed up, the answer was "yes." As time went on, others in the group used this arm test, and after awhile every aspect of the lives of the Rulo group was controlled by the use of the arm test.

Sometime in 1983, defendant began telephoning the individuals who later constituted the Rulo group with "orders from headquarters." Defendant would tell the person he called that he (defendant) had "talked to Yahweh and [the men were] supposed to go out and do some stealing . . . ." If any of the men refused to go on these stealing raids, defendant would remind them that their families would not be safe if they angered Yahweh.

The men, in keeping with the group's plans to build a "base camp," converted the spoils of these thefts into weapons, ammunition, and clothing and began to stockpile those items in preparation for the Battle of Armageddon. These stealing raids were conducted in the states of Kansas, Missouri, and Nebraska. The thefts involved the stealing of cattle, hogs, and various large items of farm machinery and construction equipment. Many of those items, including all the stolen livestock, were sold, and the proceeds financed the stockpiling mentioned above. At the time of defendant's arrest, officers recovered stolen property with a value in excess of $120,000 at the Rulo farm.

By the summer of 1983, it was determined, through the arm test, that defendant had the spirit of the Archangel Michael. Defendant also told the group that he could communicate directly with Yahweh through his mind.

The group began to meet each Saturday to study the Bible. These meetings were conducted by defendant and were usually attended by James Haverkamp; his sisters Cheryl Gibson and Lisa Haverkamp; his mother, Maxine Haverkamp; defendant's wife, Ruth; and defendant's three children. James Haverkamp's younger brother and father would also attend, as did Thimm, Andreas, Rick Stice, Stice's children, and Stice's girlfriend.

During these meetings, defendant would read and interpret various verses of the Bible. He told the group that "the Jews added" any passages that disagreed with his teachings. During these meetings, verses of the Bible were rewritten to conform to the group's beliefs. At the conclusion of these meetings, the group would smoke marijuana.

At one of these meetings, held in Kansas, where defendant and his family then lived, defendant took Cheryl Gibson aside and told her that Yahweh wanted her to leave her husband. Defendant used the arm test to determine that in Yahweh's eyes Gibson was not married to her husband, who was "on Satan's side." Defendant also told her that if she did not stay with defendant and Ruth Ryan, her husband and children would be killed in an automobile accident.

Gibson eventually left her husband, and for a time she and her children lived with Michael and Ruth Ryan. In May of 1984, a cult service was held, with Rick Stice officiating, where defendant and Gibson were married in Yahweh's eyes.

In June of 1984, defendant told his wife, Ruth, and Gibson that Yahweh wanted them to get better acquainted by going to the Rick Stice farm outside of Rulo. During the summer of 1984, defendant, Ruth Ryan, the three Ryan children (including Dennis), Rick Stice and his three children, Cheryl Gibson and her five children, James Haverkamp, Lisa Haverkamp, and James Thimm moved to the Rulo farm. In August 1984, John David Andreas and, in October, Timothy Haverkamp, a cousin of the Haverkamps, moved to the farm. This group of 7 adult men (including Dennis Ryan), 3 adult women (Ruth Ryan, Gibson, and 15-year-old Lisa Haverkamp), and 10 young children constituted the basic Rulo group. Maxine Haverkamp was a regular visitor.

In the meantime, in June of 1984, defendant officiated at the cult wedding of Rick Stice and Lisa Haverkamp, and, in August of 1984, defendant took his second cult wife by marrying Cheryl Gibson's mother, Maxine Haverkamp.

The Rulo farmstead included two trailer houses. Rick Stice was determined to be the high priest of the group, and he and Lisa Haverkamp shared a bed in the south trailer. During this period, the remainder of the group lived in the north trailer. The

men slept in a large room known as the barracks, and the women and children slept in various other rooms of the north trailer.

By August of 1984, daily life on the farm was established. The women would consult Yahweh through the arm test in order to determine meal plans, including how long to boil water, and Ryan would use the arm test to find out if any members of the group needed to fast or do penance that day.

Defendant acted as the leader of the group. He would assign tasks for the day and then spend most of his time watching television. During the evenings, defendant would direct the men on stealing raids. Apparently, defendant himself did not participate in the raids.

The group believed that the Battle of Armageddon would take place in the Rulo area, since the Battle of Armageddon was also known as the "Battle of the Wheat Fields." Defendant had observed that there were several wheat fields in the area, and concluded from this that the final battle would be waged near Rulo.

Defendant gave each of the men a military title, and within a few months all of the men were generals, some having attained five star general status, with the exception of Rick Stice, the owner of the farm, who was a six star general and the high priest.

By the fall of 1984, the group had acquired over 75,000 rounds of ammunition and dozens of weapons, including several that were fully automatic. The group also stockpiled seed, charcoal, and enough food to fill a room 20 feet wide by 35 feet long.

During the later part of 1984, Stice lost the Rulo farm due to financial difficulties. The farm was purchased by James Haverkamp and Lynn Thiele, partially with money stolen from James Haverkamp's father. During this same period, defendant determined that Yahweh was angry with Rick Stice; that Stice had raped Stice's cult wife, Lisa Haverkamp; and that Stice was having "bad thoughts." It would appear that one of Stice's more serious transgressions was losing the farm. Defendant demoted Stice and moved Lisa to the north trailer, where she shared a bed with Ruth Ryan and Cheryl Gibson.

In December of 1984, defendant took Lisa Haverkamp as his third cult wife, and on June 25, 1985, Ryan took his fourth cult wife by marrying Debra Thiele, the sister of Cheryl and Lisa. By this time, defendant was considered married to Cheryl, Lisa, and Debra and to their mother, Maxine Haverkamp, and Ruth Ryan, whom he married in a conventional ceremony in about November of 1967. Maxine did not live on the farm, but would come to the farm twice a month, apparently to perform her conjugal activities.

In December of 1984, defendant announced that Lisa Haverkamp was the queen of Israel. On New Year's Eve, defendant told the group that he and Lisa had spoken to Yahweh, and Yahweh had said that there were going to be changes on the farm. After the group smoked marijuana, defendant informed them that unless the jealousy stopped the law would come and that the children would be taken away. Defendant told the group that each individual had to make a decision on whether to remain or leave the farm; that Yahweh had indicated that anyone who elected to leave would "burn in hell"; and that if an individual elected to stay, he or she would have to stay with the group forever. Defendant said that if anyone decided to stay and then left, he would "hunt [them] down and kill [them]."

During a Saturday Bible meeting, James Thimm stated that he was not sure there was a Yahweh and expressed doubts in the arm test. Rick Stice's 5-year-old son, Luke Stice, also apparently had expressed doubts about Yahweh. After these incidents, in January or February of 1985, Thimm, Rick Stice, and Luke Stice were moved to the south trailer. Both Thimm and Rick Stice were demoted to "slaves," and Luke was called "dog," "mongrel," "gook," or "dogshit." During January and February, apparently as part of the changes Ryan had foretold, Rick Stice and Thimm were made responsible for most of the guard duty, washing of dishes, and care of the chickens and goats.

Evidence showed that about this time, defendant began to abuse Thimm, Rick Stice, and Luke Stice. Defendant threatened to amputate Rick Stice's penis and threatened to skin and then burn Luke Stice alive, and both Thimm and Rick Stice

were forced to do calisthenics. In March, defendant instructed Thimm to have anal sex with Rick Stice, and told Thimm "to make him hurt." Defendant also forced Rick Stice to perform oral sex on his son Luke and forced Luke to perform oral sex on his father while the other men watched. Ryan told the others that Yahweh wanted these acts performed in order to humiliate Thimm and Rick and Luke Stice as punishment for their having "bad thoughts."

Luke Stice died around March 25, 1985, after defendant repeatedly shoved him, causing Luke's head to strike a cabinet. Luke was knocked unconscious the third time defendant shoved him and died sometime during the night. Luke was buried the following morning in an unmarked grave that defendant forced Rick Stice and Thimm to dig.

After Luke's death, defendant forced Rick Stice to copulate with a goat on three different occasions.

During March, defendant and Lisa Haverkamp went to Kansas City for a honeymoon. Defendant left his son Dennis and Timothy Haverkamp in charge at Rulo. While defendant was gone, Rick Stice escaped. After defendant returned, James Thimm was kept chained to the south trailer porch.

After leaving the farm, Stice began to worry about "eternal damnation" and returned to the farm after 7 days. Upon his return, defendant had both Rick Stice and Thimm kept chained to the porch of the south trailer.

On April 4, 1985, Rick Stice escaped a second time after Timothy Haverkamp had taken Stice into town on defendant's orders, so that Stice could cash his Social Security check. Stice did not return to the farm and did not contact authorities until June 26, 1985.

After Stice's escape in April, the treatment Thimm received from defendant continued to deteriorate. Thimm was forced to sleep chained to the porch, was fed small birds the men shot, and was also forced to copulate with a goat. On April 27, 1985, after being accused of poisoning a turkey, Thimm was beaten by the men and taken to the hog confinement building, where he was kept chained for the night. At this time, the adult men present on the Rulo farm were: defendant; Dennis Ryan; Timothy Haverkamp; James Haverkamp; John David

Andreas; and the victim, James Thimm. Ruth Ryan, Cheryl Gibson, and Lisa Haverkamp were the adult women there, and there were nine young children.

On April 28, 1985, defendant sent Andreas out to Thimm with a bowl of granola cereal. Defendant informed the men during breakfast that "Yahweh would be pleased if [Thimm] lasted four or five days." At about mid-morning, defendant and the rest of the adult men went to the hog confinement building. Defendant instructed Thimm to disrobe and to bend over a farrowing crate.

Defendant then told Thimm that he was going to be sexually assaulted with a shovel handle. Defendant then inserted a shovel handle into a grease cartridge and told the men that Thimm had not done a good enough job with the goat and that Yahweh wanted Thimm "probed." Defendant then inserted the shovel handle about 5 or 6 inches into Thimm's rectum and "probed" Thimm for about 30 seconds. When Thimm would not stop fidgeting, defendant tied Thimm's arms to the farrowing crate with baling wire.

Defendant then informed the men that Yahweh had said that he wanted the handle inserted between 8 and 10 inches and had given defendant the order in which each man was to probe Thimm. A tape measure was then used, and the shovel handle was marked. While defendant had the handle inserted in Thimm's rectum, he told Thimm, "I ought to shove this thing up to your heart." (One of the examining pathologists testified that, in fact, the shovel handle was inserted some 2 feet into Thimm.) Each of the remaining four men then took their turns probing Thimm's rectum with the shovel handle. After Thimm screamed a couple of times, defendant kicked Thimm in the head and had furnace tape put over Thimm's mouth so that the men would not have to hear Thimm's cries.

After the probing, defendant instructed Thimm to sign his car title over to Timothy Haverkamp. Thimm did so, and apparently defendant told Timothy Haverkamp that Thimm's car was his birthday present.

Each man, beginning with defendant, probed Thimm again. During this second round of probing Thimm's rectal wall was ruptured. Defendant decided that the handle was being inserted

too far and that they needed an object that was bigger around. Defendant then greased the fat end of a pick handle and inserted it into Thimm's rectum about 3 inches. After this second round of probing, the men left to do some chores and left Thimm chained in the hog confinement shed.

That afternoon defendant told the men that Thimm had not been punished enough. The men returned to the hog confinement building, and Thimm was removed from the farrowing crate and bound to an overhead auger. Each of the five men then gave Thimm 15 lashes with a leather whip. Defendant began the whipping, and with each lash one of the cult members' names was called out. During this whipping Thimm said, "I'm sorry, Yahweh, please forgive me what I've done. Please stop this." Whereupon defendant said, "Well, you don't need to worry about that, because Yahweh's given up on you. You don't have any hope any more."

After this whipping Thimm was untied, given his sleeping bag, and chained up for the night.

During breakfast of the following morning (April 29, 1985), defendant told the men that Thimm had still not been punished enough. The men returned to the hog confinement building, and Thimm was again tied to an overhead auger. Beginning with defendant, each man gave Thimm 15 lashes with the leather whip.

After Thimm had received 75 lashes, defendant said that Thimm had still not received enough punishment. Thimm was forced to lie with his freshly whipped back on the floor. Thimm was then bound to a pipe, and each of the five men lashed Thimm's chest and stomach 15 times.

Defendant then had Thimm's left hand placed and bound palm up on a block of wood. Thimm began to moan, and defendant told him things would only get worse if he did not shut up. Defendant then shot one of Thimm's fingertips off with a pistol. Michael Ryan then instructed each man to shoot off one of Thimm's remaining left hand fingers and his thumb.

After the men had shot off Thimm's fingers, they returned to the north trailer for lunch. At lunch defendant told the men that Yahweh wanted Thimm dead by that afternoon. The men returned to the hog shed; defendant told Andreas to disk over

the field to prepare an area to bury Thimm and told Andreas that he should go say goodbye to his friend James Thimm. When Andreas said goodbye, Thimm was still alive and able to say that he was "sorry."

Defendant then kicked and broke Thimm's arm and told Thimm that he was going to skin a part of him. Defendant put on a pair of yellow kitchen gloves and used a razor blade to make incisions in Thimm's leg, and then used a pliers to pull off strips of Thimm's skin. Thimm was still alive at the time. Defendant then told Dennis Ryan that he could break one of Thimm's legs. Dennis took a rough-cut 2 by 4 board about 7 feet long and proceeded to strike Thimm's leg in the knee area until Thimm's leg broke. Defendant told Dennis Ryan and Timothy Haverkamp that there was an easier way to break a leg. Defendant then placed a block of wood under Thimm's leg and told Timothy Haverkamp to hit Thimm's leg with the 2 by 4. Timothy Haverkamp hit the leg once and it broke.

Defendant then bent down and asked Thimm if he thought Yahweh meant business. Thimm was alive at this time. Defendant then said, "I'll cave his chest in. . . . That's sure to kill him." Defendant then proceeded to stomp on Thimm's chest with his cowboy boots.

Defendant then had James Haverkamp get Thimm's sleeping bag. Timothy Haverkamp testified that Thimm was dead before James Haverkamp returned with the sleeping bag. Defendant placed Thimm's body and clothing into the sleeping bag. Three or four hours later, defendant told the men that Yahweh wanted the grave to be "six foot long by three foot wide and six foot deep." The men dug the grave. Thimm's body was placed in the unmarked grave, and defendant told Timothy Haverkamp to shoot Thimm's body in the head so it would look like an execution. After Thimm's body had been shot in the head, it was covered with dirt.

An autopsy of the body was conducted for the State by George Gamel, M.D., on August 19, 1985, and by William Eckert, M.D., on behalf of the defendant, on September 3, 1985. Both autopsies revealed the following injuries: The anus was markedly dilated; the left hand's fingertips had gunshot-type injuries; the left arm was broken; both legs were

fractured at the thigh level; the head had a gunshot wound, which shot had shattered the left side of the skull; there were multiple rib fractures on both the left and right sides of the chest and back; a blunt object had been inserted far up into the body cavity through the anus, causing damage to the liver; the colon was torn; linear bruises were on the body; and skin had been stripped from one of the legs. The victim's wrists and ankles were still bound with baling wire. The only disagreement between Drs. Gamel and Eckert was whether the victim's penis and scrotum had been cut away or had decomposed. Both pathologists reported that the cause of death was multiple traumatic injuries. Dr. Gamel testified the tear in the colon, the "whipping-like injuries," the gunshot wound to the head, the shock from the broken legs, and the crushed chest were all capable of causing the victim's death independently.

On June 25, 1985, James Haverkamp and Andreas were apprehended while attempting to return to the Rulo farm with a sprayer rig stolen in Kansas. While incarcerated, these men gave law enforcement officials information that was used to secure a search warrant. A team of law enforcement officers composed of FBI agents, Bureau of Alcohol, Tobacco, and Firearms agents, Nebraska State Patrol officers and investigators, and Richardson County sheriff's personnel, assisted by James Haverkamp and Andreas, searched the Rulo farm on August 17 and 18, 1985. On August 18, 1985, James Thimm's nude, partially decomposed body was found, and on September 25, 1985, the defendant was charged with Thimm's murder.

The foregoing facts were testified to by each of the five men involved in the murder. James Haverkamp, Timothy Haverkamp, John David Andreas, Dennis Ryan, and defendant himself each testified, in detail, as to the specific instances of probing, whipping, shooting, kicking, and beating. There is surprising agreement in the detailed facts related by each man.

Defendant's testimony is reflected in 291 pages of the record herein. He sets out his participation in the horrifying acts committed on Thimm and does not deny that the testimony of the other four criminals is generally true. In his testimony, defendant made the following points as to the testimony of the

others, setting out his disagreements with the testimony of the other four. Defendant testified that James Haverkamp was the instigator of most of the thefts, that defendant did not force Andreas to go to the Rulo farm, that the victim and Andreas were not best friends, that defendant did not always lead the Bible studies, that Cheryl Gibson testified against defendant only because she was threatened by the FBI, that defendant did not want to steal, that defendant was tired of the people on the farm and wanted to leave, that Lisa Haverkamp had more power than defendant, that Rick Stice was responsible for the abuse of his son Luke, that it was not defendant's idea for Stice and Thimm to have homosexual relations, and that defendant tried to stop the homosexual activities.

The denials, of course, were as to essentially peripheral activities at the farm. As to the murder incident itself, defendant did not deny and, indeed, specifically testified to the torture itself and to Thimm's death. Defendant did testify, in contradiction to the testimony of others, as to some specific instances. Defendant testified that Yahweh, not defendant, had Thimm chained in the hog shed; that Thimm agreed to his torture; that defendant did not kick Thimm in the head; that Yahweh would not allow the group to drive Thimm off the farm; that Timothy Haverkamp "tore" Thimm open while probing him; that defendant did not stomp on Thimm's chest with his boots; that Andreas and James Haverkamp stomped on Thimm's chest, and Thimm was not breathing after this; that defendant told the group to leave Thimm alone; and that James Haverkamp had the idea of shooting Thimm's fingers off.

Defendant further testified that everyone came to the Rulo farm of their own free will and that he, the defendant, did not intend to kill Thimm.

The defendant argues his 60 assignments of error in 30 separate arguments. While we are primarily concerned with the defendant's assignments of error, that is, defendant's allegations as to the specific actions of the trial court which prejudiced him, we will consider the assignments as defendant sets them out in the arguments in his brief in order to ensure that all points raised on this appeal are considered. After considering all of defendant's assignments, we affirm.

Our review of the record has been complicated due to the way the record has been presented to us. Although complete, the record does not appear to follow any logical order. The pages are not numbered sequentially, several volumes have the same number, and many pages have the same page number. This procedure is a violation of this court's rules. In view of the fact that this is a capital case, however, we have reviewed the record before us. We determine that the entire record ordered by defendant in his praecipe is before this court, and we have not been advised by either party to the contrary.

One cause of this state of disorder appears to stem from the fact that the sentencing judge purported to take judicial notice of the trial record. This procedure is discussed below in defendant's argument XVII. During the defendant's sentencing hearing the evidentiary part of the trial, on the guilt-innocence phase, was marked as exhibit 1. Exhibit 1 consists of 18 volumes with olive-colored covers numbered VIII through XXV, containing trial testimony from pages 1052 through 4542; 2 volumes with tan covers numbered XXX and XXXI, containing trial exhibits 1 through 128 (except exhibit 33); and 1 volume with a green cover numbered XXXII, containing trial exhibits 129 through 143 (except exhibit 142).

That portion of the entire record was marked as an exhibit at the sentencing phase. Necessarily, that part of the record was also fully considered in our review of the guilt-innocence phase of the trial.

Trial exhibits 144, 145, and 146 (not a part of sentencing exhibit 1) are contained in a brown folder numbered XXIX.

The remainder of the record before us consists of the following. The defendant's arraignment is found in the first 13 pages of a 37-page volume with a blue cover numbered I, and a portion of the motion hearings are in the same volume at pages 14 through 37. Progression hearings are found in two volumes with blue covers numbered II and III, containing pages 18 through 399. Motion hearings are found in a volume with a blue cover numbered VI, containing pages 735 through 985, with an additional part in volume I mentioned above. The pretrial conference is found in a volume with a light-blue cover numbered VII, containing pages 986 through 1043. The jury

voir dire is found in four volumes with blue covers numbered II, III, IV, and V, pages 38 through 991, and one volume with an olive cover numbered VIII, with pages 1044 through 1051 containing further voir dire. Opening statements are found in pages 992 through 1052 of blue volume V. Other exhibits, marked in connection with motion in limine hearings, are found in a volume with a blue cover numbered XXVIII, containing exhibits 1 through 143, 147 through 156, and two additional exhibits both marked as exhibit 1 (these exhibits are different from trial exhibits, although they have the same numbers).

The instruction conferences are found in a blue volume numbered V, between pages 1053 and 1112; a volume with a light-blue cover numbered XXVI, containing pages 4543 through 4563; and pages 1301 through 1312 in a volume with a blue cover numbered VI. Closing arguments are found in the same blue volume VI on pages 1113 through 1301. The hearing on the defendant's motion for a new trial is found in blue volume VI at pages 1313 through 1347. The sentencing hearing is found in a blue volume VII at pages 1348 through 1586. The hearing on the defendant's motion for a new trial on the sentencing phase is also found in the same volume VII at pages 1586 through 1589. Sentencing exhibit 1 is the trial itself, and sentencing exhibits 2 through 26 are found in two separate brown boxes.

This listing of the various items in the record in this court shows that the portions of the record requested by the defendant in his praecipe are before us.

I. *"The Defendant cannot be deprived of his constitutional rights to counsel (Assignment #1)."*

Defendant first assigns as error the actions of the trial court in "terminating and dismissing his court-appointed counsel Mr. [Louie] Ligouri" and the actions of the court "directed towards Mr. Ligouri which preceded said termination . . . and which impaired his effectiveness . . . ."

The second part of assignment of error No. 1, as affecting the effectiveness of counsel, is included within assignment No. 2 discussed below. As to the first part of the assignment, the termination of attorney Louie Ligouri, the defendant contends

that he was deprived of his constitutional right to counsel when Ligouri was terminated by the district court on April 25, 1986, after the trial was concluded. Throughout the trial and the preliminary proceedings, defendant was represented by two attorneys, Richard Goos and Ligouri, both of whom had been appointed on October 8, 1985. The record shows that Ligouri had been in practice in Richardson County for 6 years, had tried four criminal jury trials, and had no first degree murder trial experience. Goos was a member of the Lancaster County Public Defender's office and had been in practice for over 24 years, with the 15 years prior to the defendant's trial dedicated exclusively to criminal law. Before this trial, Goos had tried eight or nine first degree murder cases. The record shows that the court treated Goos as lead counsel for the defense.

The defendant was represented by both Ligouri and Goos until, as mentioned above, Ligouri's services were terminated 15 days after the jury had returned its verdict. At the hearing on the termination of Ligouri's services, the court told Goos that if he needed additional help, he should notify the court. The record does not disclose any such request. Goos then continued to represent defendant through the sentencing hearing. On some date not shown in the record, Bruce Dalluge was appointed as cocounsel for defendant. The record does show that both Goos and Dalluge appeared before the court with defendant, as his attorneys, on July 28, 1986, so it is apparent that Dalluge was appointed before that date. Goos withdrew as defendant's attorney sometime after the sentencing hearing, and Dalluge continued to represent defendant on this appeal. Defendant was represented by Goos and Dalluge during his sentencing hearing. It is not apparent from the record why the trial court substituted Dalluge for Ligouri, but the result was that defendant had two attorneys throughout sentencing, as well as two attorneys throughout the trial.

It is settled law that an accused is entitled to be represented by counsel at all critical stages of criminal proceedings against him, including sentencing. *Michigan v. Jackson*, 475 U.S. 625, 106 S. Ct. 1404, 89 L. Ed. 2d 631 (1986); *State v. Jost*, 219 Neb. 162, 361 N.W.2d 526 (1985). The exercise of sixth amendment rights to counsel is subject to the necessities of judicial

discretion. *State v. McPhail*, 228 Neb. 117, 421 N.W.2d 443 (1988); *State v. Eichelberger*, 227 Neb. 545, 418 N.W.2d 580 (1988). While it often happens in this state that two attorneys are appointed to represent a criminal defendant in a capital case, neither the U.S. nor the Nebraska Constitution dictates such a requirement. *Bell v. Watkins*, 692 F.2d 999 (5th Cir. 1982). The defendant's constitutional right to counsel did not include the right to have the two attorneys representing him throughout the trial also represent him during his sentencing and on the appeal.

In view of the seriousness of the charges and the bizarre nature of the underlying facts, the trial court, acting properly within its discretion, felt that it was appropriate to appoint two attorneys to represent defendant throughout the trial and its preliminaries. In exercising its discretion, the district court then determined that Ligouri's services would then be terminated. For reasons not apparent on the record before us, the trial court later appointed Dalluge as the attorney to continue working with Goos. In view of the terrible, horrifying facts brought out by all the evidence, including defendant's testimony, as to defendant's participation in this crime, it is not possible for this court to hold that the trial court abused its discretion in terminating Ligouri. The reasons for the termination and the subsequent appointment of a different lawyer are not apparent from the record before us, but we are not concerned with the wisdom of the action, but only its legal effect.

To sustain a claim of ineffective assistance of counsel, the defendant must show that (1) counsel's performance was deficient and (2) such deficient performance prejudiced the defense. *State v. Ditter*, 232 Neb. 600, 441 N.W.2d 622 (1989). The defendant has made no such showing, and complains only that he had a better rapport with Ligouri. Such a consideration is irrelevant. An indigent defendant's right to counsel does not include a right to be represented by counsel of his choice and to be represented by an attorney he likes or with whom he has rapport. *State v. McCoy*, 228 Neb. 178, 421 N.W.2d 780 (1988); *State v. Hoffman*, 224 Neb. 830, 401 N.W.2d 683 (1987); *State v. Clark*, 216 Neb. 49, 342 N.W.2d 366 (1983). Defendant has received effective representation.

His concern about the fact he was deprived of the service of an attorney with whom he had rapport does not control the legal issue before us on this point. Defendant's assignment of error with regard to the particular counsel to whom he was entitled is without merit.

II. *"The Court should not interfere with counsel's obligation to zealously represent his client (Assignment #2)."*

As his second assignment, defendant sets out that he was denied "a fair trial and Due Process of Law, Effective Assistance of Counsel, and his right to an Impartial Jury" by the actions of the trial court in "impairment of cross examination . . . ."

The defendant also asserts that the trial court interfered with his counsel's obligation to zealously represent him. Defendant states:

> Throughout the trial the Court curtailed Defendant's counsel from putting on a proper defense. On numerous occasions, Defendant's counsel was denied the right to cross-examine witnesses, was interrupted by the Court without any objection from counsel, and witnesses were allowed to continually answer questions in a [sic] unresponsive manner.

Brief for appellant at 34.

In support of these contentions the defendant cites this court to 10 areas of the record. All 10 of the citations are from the cross-examination of Rick Stice by Ligouri. Defendant, in his second assignment, specifically refers to the court's alleged errors in its conduct during the testimony of Stice. Stice was called by the codefendant Dennis Ryan, and during his direct examination, Stice testified as to his status as "high priest" of the group. During cross-examination of Stice by Dennis Ryan's attorney, that attorney spent 45 minutes attempting to impeach Stice on this issue with testimony Stice had given during a deposition. During the cross-examination of Stice by Ligouri, acting as defendant's attorney, Ligouri asked Stice 20 different times, in several different ways, whether he was a "high priest," and Stice consistently answered that he was to be the high priest after the Battle of Armageddon.

At this point the trial court requested a side bar. The reporter

noted that the record was made in "low tones," and the judge, in apparent frustration, stated, "Who gives a damn whether he was a high priest or not, for God's sake? . . . [Codefendant's counsel] went at him for 45 minutes on the high priest deal. Are you going on for another 45 minutes?" Whereupon the following exchange took place:

> MR. LIGOURI: I want to cross examine him on this. If he is lying about one thing, he's lying about everything.

> THE COURT: Mr. Ligouri, keep your tone down, okay?

> That's enough on the high priest business.

> MR. LIGOURI: I just want to introduce these depositions.

> THE COURT: Okay, introduce them.

Assuming testimony concerning whether Stice was the high priest or said he was the high priest was relevant, Neb. Rev. Stat. § 27-403 (Reissue 1985) states that "evidence may be excluded if its probative value is substantially outweighed . . . by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The trial court did not abuse its discretion by terminating the cross-examination of Stice on this issue. At some point, the trial court is entitled to try to bring some order out of chaos. This action of the trial court was no more than that. In *Treppish v. State*, 126 Neb. 21, 33, 252 N.W. 388, 393 (1934), the defendant was charged with first degree murder and claimed on appeal that the trial court "interfered in the examination of defendant's witnesses, continually urging the defendant's attorneys in their examination of witnesses to hurry, and continually interrupting the defendant's attorneys in their examination of witnesses . . . ." In *Treppish*, we stated:

> It is the duty of a trial court to expedite the trial as much as is possible without infringing the rights of the parties to a complete and orderly examination of all the facts and circumstances connected with the case. In his endeavor to expedite the trial in this case, the trial judge used some expressions that perhaps would have been better omitted. However, we are satisfied reversible error cannot be predicated thereon.

*Id.* at 33-34, 252 N.W. at 393.

The trial court did not abuse its discretion by terminating the continued cross-examination of Stice on whether he was the high priest. Examination of the record shows this assignment of error is without merit and borders on the frivolous.

In his brief, defendant cites the Stice cross-examination as an "example" of the court's interference with his right of cross-examination. Counsel cites us to no other alleged "interference" by the court. We have examined the entire record, and our examination discloses some acrimony between the court and counsel (primarily expressed in hearings outside the presence of the jury), but no prejudicial interference with counsel. Defendant's second assignment of error has no merit.

III. "*After the joinder of two informations which each charge a different Defendant the Court has a duty to sever the cases if it appears either of the Defendants will be prejudiced (Assignments #3, #4, and #5).*"

In his assignment No. 3, defendant contends, in substance, that he was prejudiced by the trial court's failure "to sustain defendant's MOTION FOR SEVERANCE of his case from that of the Co-defendant's during the progress of the trial." His argument makes it clear that defendant's contention is directed to severance of his trial from the trial of his son Dennis Ryan.

Defendant, Michael Ryan, and his son Dennis Ryan could have both been charged with the same act, the murder of James Thimm. Neb. Rev. Stat. § 29-2002(2) (Reissue 1985). Since the charges could have been so joined, it was not error, per se, to try Michael Ryan and Dennis Ryan in a consolidated trial. § 29-2002(3). See *State v. Lee*, 227 Neb. 277, 417 N.W.2d 26 (1987).

The record shows that on December 23, 1985, on the motion of the State, the court ordered case No. 2390, count I, State of Nebraska v. Michael W. Ryan; case No. 2384, State of Nebraska v. Dennis Ryan; and case No. 2389, State of Nebraska v. Timothy Haverkamp, consolidated for trial. Defendant objected to the joinder of his case with Timothy Haverkamp's case and moved that case be severed. As to severance of Dennis Ryan's case, the record does not show that defendant initially moved for severance, nor was severance

granted. Defendant admits that while he objected to joinder of his case with Timothy Haverkamp's case, he "did not make any objection at the time to the joinder of his case with his son, Dennis Ryan." Brief for appellant at 36. The record shows that at the conclusion of the State's evidence, defendant's counsel moved that the court

> sever . . . the case of Michael Ryan from the case of his son, Dennis Ryan, on the grounds that it I think became apparent to us, certainly yesterday, that it's going to be very difficult for Michael Ryan to have a fair trial when he is to be tried with his son and when the defense for his son is bringing in inflammatory and irrelevant matters to defend their client.

Defendant's oral motion for severance was then denied.

Defendant's position on severance was amplified during the instruction conference at the end of the trial, when the following discussion was held on the record outside the presence of the jury:

> THE COURT: Well, you didn't complain initially about joining the trials, and I could never understand that.
>
> MR. GOOS: I'm sorry, Judge, what?
>
> THE COURT: Did you — You didn't complain initially about consolidating the trials.
>
> MR. GOOS: Well, we had, tactically, something to gain from that. For example, no death qualification. Apart from legal things, it afforded the defendant a chance to see and be with his son throughout the trial, something that, you know, if he's convicted, he may have trouble seeing that boy for a long, long time, and — And so that he personally wanted a joint trial; and there is another reason which I — I — Well, a reason or two why we were not objecting to the joinder so much.

As stated above, at the close of the State's case, the defendant moved for severance of his case from Dennis Ryan's. A similar problem was present in *State v. Cook*, 182 Neb. 684, 157 N.W.2d 151 (1968), where defendant Cook moved for severance of his case from that involving a codefendant, after both the State and Cook had completed their evidence in the case. This court overruled defendant's motion, stating:

> To permit a defendant to proceed to trial without making a motion for severance and to take his chances on a favorable result in the absence of extraordinary circumstances or surprise would permit a defendant to defeat the orderly processes of justice and defeat the expeditious and constitutional purpose embodied in our severance statute, section 29-2002, R.R.S. 1943. . . . Under our present statute, section 29-2002, R.R.S. 1943, amended in 1957, jointly charged defendants are not entitled to a separate trial as a matter of right but are entitled to a separate trial if it appears that the defendant or the State would be prejudiced by the joining of the offenses or the defendants in a joint trial. The proper rule is stated in State v. Brown, 174 Neb. 387, 118 N.W.2d 328, wherein the court said: "The right to a separate trial now depends upon a showing that prejudice will result from a joint trial. A motion for a separate trial is addressed to the sound discretion of the trial court, and its ruling on such a motion will not be disturbed in the absence of a showing of an abuse of discretion. Opper v. United States, 348 U.S. 84, 75 S. Ct. 158, 99 L. Ed. 101, 45 A.L.R.2d 1308 . . . ."

*State v. Cook, supra* at 688, 157 N.W.2d at 154.

Similarly, in the case before us, there is no reason to let a defendant make a tactical choice in the conduct of his trial and then, when dissatisfied with the results of his choice, make a different choice. It is left to the discretion of a trial court whether the trial of two codefendants should be severed. *State v. Clark*, 228 Neb. 599, 423 N.W.2d 471 (1988); *State v. Lee, supra*. Pursuant to § 29-2002, two or more defendants may be tried together. There is no constitutional right to a separate trial, and a separate trial will only be granted upon a showing of prejudice. *State v. Clark*, 189 Neb. 109, 201 N.W.2d 205 (1972). A ruling of the trial court regarding severance will not be disturbed without a showing of prejudice. *State v. Nance*, 197 Neb. 95, 246 N.W.2d 868 (1976). Defendant was not prejudiced by the joinder of his trial with the trial of Dennis Ryan.

With regard to his assignment No. 4, defendant contends that the trial court erred in refusing "to orally instruct or admonish the jury that evidence pertaining solely to Dennis

Ryan, Co-defendant, should be considered only as evidence against or for Dennis Ryan and not this defendant . . . ." There are two procedural ways that such problems may be handled in a trial involving codefendants. It is not necessary that the judge, during such a trial, give an oral admonition to the jury as to how each item of evidence presented in the case shall be considered by the jury. Whether a judge chooses to do so as the trial progresses is within his discretion. So long as the jury is properly instructed as to how it is to consider such evidence, a defendant's due process rights are not violated. In this case, the judge did instruct the jury, at the conclusion of the case, as to how the jury should consider the evidence as it concerned each defendant.

Defendant points to Neb. Rev. Stat. § 27-105 (Reissue 1985), which states: "When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the judge, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."

While the giving of a limiting instruction is mandatory when requested, it is within the trial court's discretion whether to give a limiting instruction contemporaneously with the testimony or in the general instructions to the jury. *Lowther v. United States*, 455 F.2d 657 (10th Cir. 1972), *cert. denied* 409 U.S. 857, 93 S. Ct. 139, 34 L. Ed. 2d 102, and 409 U.S. 887, 93 S. Ct. 114, 34 L. Ed. 2d 144.

Defendant's contention that it is a violation of his constitutional rights when the court does not contemporaneously rule on the application of each piece of evidence to one or another of codefendants is without merit.

In his fifth assignment, defendant seems to admit that the trial court had the right to instruct the jury at the end of the case, but contends that the court, in so doing, confused the jury.

NJI 14.54 provides:

Though the defendants are tried together, it is your duty to consider separately the guilt or innocence of each defendant. Each defendant is entitled to have his guilt or innocence determined from his own conduct and from the evidence which applies to him, as if he were being tried

alone. Evidence relating to one defendant alone may not be considered against the other defendants. . . . You will not permit any defendant to be prejudiced by reason of the fact that the defendants are jointly charged with a criminal offense.

NJI 14.54A provides:

In this case . . . defendants are being tried together. During the trial you were told that certain evidence was admitted against one (or more) of the defendants and not against the other(s). You must consider such evidence only in the case of the defendant(s) against whom it was admitted.

During the discussion concerning these instructions the following record was made:

THE COURT: You wanted 14.54A rather than 14.54.

MR. GOOS: Well, no, I wanted 14.54, but I want it in the language of that — of that instruction, and I wanted that language out of 14.54, that says "During the trial you were told that certain evidence was admitted, . . ." etcetera. And since that was the case, I think it ought to be in the instruction. I see 14.54A as an entirely different separate instruction than — and I would — I'm simply asking the Court instruct — give 14.54 in its entirety, and in addition, give 14.54A.

. . . .

THE COURT: Okay. Then, Instruction Number 6, we combined 14.54 and 14.55A (sic).

MR. REHMEIER: Oh, I see.

THE COURT: I don't think they were ever intended to both be given. Does the State have any objections?

MR. REHMEIER: No, Your Honor.

THE COURT: Defendant Michael Ryan?

MR. GOOS: No objection. What was that number again, Judge?

THE COURT: Six.

MR. GOOS: Number 6? No objection.

Instruction No. 6 reads as follows:

Though the defendants are tried together, it is your duty to consider separately the guilt or innocence of each

defendant. Each defendant is entitled to have his guilt or innocence determined from his own conduct and from the evidence which applies to him, as if he were being tried alone. Evidence relating to one defendant alone may not be considered against the other defendant. During the trial you were told that certain evidence was admitted against one of the defendants and not against the other. You must consider such evidence only in the case of the defendant against whom it was admitted. You will not permit any defendant to be prejudiced by reason of the fact that the defendants are jointly charged with a criminal offense.

There was no error or abuse of discretion on the part of the trial judge. The giving of instruction No. 6 adequately charged the jury and must be presumed to have protected the defendant from prejudice. See, *United States v. Buschman*, 527 F.2d 1082 (7th Cir. 1976); *United States v. Weil*, 561 F.2d 1109 (4th Cir. 1977); *United States v. Papia*, 560 F.2d 827 (7th Cir. 1977); *United States v. Campanale*, 518 F.2d 352 (9th Cir. 1975), *cert. denied* 423 U.S. 1050, 96 S. Ct. 777, 46 L. Ed. 2d 638 (1976).

The defendant's counsel agreed to an instruction that acknowledged that the jury had received a limiting instruction. The briefs do not direct us to a part of the record showing that such a limiting instruction was given during the testimony concerning the codefendant.

In reading both NJI 14.54 and NJI 14.54A, we note that NJI 14.54 appears to be the instruction a trial court would give where the jury had not been given a limiting instruction during the trial and that NJI 14.54A, which contains the language "During the trial you were told that certain evidence was admitted against one (or more) of the defendants and not against the other(s)," is intended where the court has instructed the jury during the trial. Defendant, in his fifth assignment, contends that this language confused the jury. We do not determine that it did, but in any event, defendant's counsel agreed to the instruction as given. Defendant's fifth assignment is without merit.

IV. "*The trial court denied the Defendant a fair trial by allowing into evidence irrelevant uncharged crimes, wrongs or acts (Assignment #6).*"

In his sixth assignment of error, the defendant contends that the trial court denied him a fair trial by admitting into evidence uncharged crimes, wrongs, or acts. Neb. Rev. Stat. § 27-404(2) (Reissue 1985) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Defendant points out that we have held that the admission of irrelevant uncharged misconduct evidence is reversible error. *State v. Moore*, 221 Neb. 706, 380 N.W.2d 288 (1986); *State v. Coca*, 216 Neb. 76, 341 N.W.2d 606 (1983); *State v. Stewart*, 209 Neb. 719, 310 N.W.2d 706 (1981). Each of the cases referred to by defendant, however, concerns a defendant tried for crimes the defendant committed alone, and concerns other activities of that defendant. There was no issue in those cases as to the relationship between the named defendant and others, all of whom were engaged in committing the same crime, such as in this case. In this case, in order to present a true picture to the jury of the relative culpability of the five participants in the death of James Thimm, it was appropriate for the State to present evidence showing the relationship of defendant to the other participants. All the evidence presented by the State in the way of defendant's actions which consisted of uncharged crimes tended to show defendant's dominance over the group. Such dominance was shown by defendant's ordering others to engage in such sordid acts as homosexual and bestial conduct—and in the fact that others followed such orders. See *People v. Manson*, 61 Cal. App. 3d 102, 132 Cal. Rptr. 265 (1976).

The State was relying on the testimony of persons engaged in the same actions charged against defendant. Necessarily, the testimony of such criminals was indispensable to the State's case. Testimony before the jury showed that those witnesses were permitted to plead to crimes lesser than murder in the first degree, and the jury was entitled to know of the relative involvement of all involved in this terrible crime. As set out in *State v. Riley*, 199 Mont. 413, 426, 649 P.2d 1273, 1280 (1982):

We hold that the jury is entitled to view the death of James Gill in the context of prior events and that the beatings inflicted by the other people in the community were not isolated events, but part of a continuous series of beatings inflicted by appellant and others over a period of months. To properly understand the events that took place before James Gill's death, the jury was entitled to consider all of these factors of child abuse prior to the boy's death.

It was also proper for the State to show defendant's dominance of the Rulo group in order to present evidence to the jury with regard to the testimony of the accomplice witnesses. As stated in *U.S. v. Scarfo*, 850 F.2d 1015, 1020 (3d Cir. 1988),

> The other crimes history was relevant to the government's case. If accepted by the jury, the testimony was also damaging to defendant. That impact, however, does not require exclusion here where the evidence was essential in the government's effort to establish the credibility of its disreputable, yet indispensable, witnesses.

Evidence of relevant uncharged misconduct may be admissible, and the admission of evidence of uncharged crimes lies largely within the discretion of the trial court. *State v. Baker*, 218 Neb. 207, 352 N.W.2d 894 (1984); *State v. Ellis*, 208 Neb. 379, 303 N.W.2d 741 (1981). In *State v. Hitt*, 207 Neb. 746, 749, 301 N.W.2d 96, 99 (1981), we held:

> [E]vidence of other criminal acts which involve or explain the circumstances of the crime charged, or are integral parts of an overall occurrence . . . may be admissible. It is competent for the prosecution to put in evidence all relevant facts and circumstances which tend to establish any of the constituent elements of the crime with which the accused is charged, even though such facts and circumstances may prove or tend to prove that the defendant committed other crimes.

See, also, *State v. Williams*, 205 Neb. 56, 287 N.W.2d 18 (1979); *State v. Nielsen*, 203 Neb. 847, 280 N.W.2d 904 (1979).

In the present case, five individuals took part in the acts resulting in the death of James Thimm. The State was entitled to produce evidence which would show that the defendant was the leader of those who took part in Thimm's murder.

Evidence that the defendant's control over the group included the ability to order sexual assaults, bestiality, and the abuse of a child was probative in that it showed the defendant's absolute power over the group. This evidence was probative of the defendant's overall motive, intent, and plan in his Rulo operation, and demonstrated the circumstances that led to the torture death of Thimm. The responsibility for maintaining the delicate balance between the probative and prejudicial effect of evidence lies largely within the discretion of the trial court. *State v. Williams, supra.*

There is a further reason the evidence of uncharged crimes was admissible. Defendant had entered a plea of "not responsible by reason of insanity." Both for the benefit of the State and the defendant, the jury was entitled to know the circumstances leading up to the murder of Thimm. Without the background of those circumstances, the actual torture death of Thimm would be incomprehensible to a jury hearing just that evidence. The overall relationship among defendant, his accomplices in the murder, and the victim is essential to the understanding of the case by the jury.

The U.S. Supreme Court has set out the requirements for the admissibility of evidence under Fed. R. Evid. 404(b), the equivalent of Neb. Evid. R. 404(2). The Supreme Court stated there were four guidelines for admissibility under that rule: (1) The evidence must have a proper purpose; (2) the evidence must be relevant; (3) the probative value of the evidence must outweigh its potential for unfair prejudice; and (4) the court must instruct the jury to consider the evidence only for the purpose for which it was admitted. *Huddleston v. United States,* 485 U.S. 681, 108 S. Ct. 1496, 99 L. Ed. 2d 771 (1988).

In this case each of those criteria has been met. The trial court did not abuse its discretion in admitting the evidence of other crimes committed by, or participated in by, defendant.

V. *"The jury should be instructed as to the consequences of an insanity verdict to avoid speculation and conjecture (Assignment #7)."*

Defendant tendered an instruction (defendant's requested instruction No. 2) which purported to set out, in detail, the procedures which would be followed "in the event of a verdict

of acquittal on grounds of insanity . . . ." The instruction was refused, and defendant assigns that action of the court as error.

The law in this state on the question presented by defendant has been settled since 1979. In *State v. Reeves,* 216 Neb. 206, 218-19, 344 N.W.2d 433, 443 (1984), we held:

> The defendant assigns as error the trial court's refusal to instruct the jury with regard to the consequences of an acquittal by reason of insanity. In *State v. Reitenbaugh,* 204 Neb. 583, 284 N.W.2d 19 (1979), and *State v. Williams,* 205 Neb. 56, 287 N.W.2d 18 (1979), we held that it was not error for the trial court to refuse to instruct a jury in a criminal case of the consequences of a verdict of not guilty by reason of insanity. Our reason for so holding was that, " 'in the absence of some specific statutory provision, a defendant's disposition is not a matter for the jury's concern.' " *Reitenbaugh, supra* at 585, 284 N.W.2d at 20.

Defendant's contention in this regard is without merit.

VI. *"Diminished capacity instruction should be given to jury if any sufficient evidence of the defense exists (Assignment #8)."*

In his eighth assignment of error, defendant contends that the trial court erred in refusing to give defendant's requested instruction on the question of defendant's "diminished capacity" to form the intent necessary to commit murder in the first degree.

Such an instruction is not required under our law. In *State v. Vosler,* 216 Neb. 461, 467, 345 N.W.2d 806, 810 (1984), this court stated: "This court said therein [in the case of *Starkweather v. State,* 167 Neb. 477, 93 N.W.2d 619 (1958)] that a special diminished capacity instruction need not be given where the jury had otherwise been properly instructed that intent was an element of the crime charged." The trial court did not err in refusing to give defendant's requested instruction as to "diminished capacity."

In the case before us, the court fully instructed the jury on the issues of intent and insanity. Aside from the general instruction on intent, the trial court instructed, in part, as follows:

> You may consider any evidence received concerning the

defendant's mental condition as it bears on the presence or absence of the intent necessary to prove the crime charged. It is for you to determine from all of the facts and circumstances in evidence whether or not each defendant had the criminal intent or purpose [necessary to find the defendant guilty of first degree murder or murder in the second degree.]

Defendant's eighth assignment is without merit.

VII. *"When the Defendant raises the issue of sanity the state should have the burden of proving beyond a reasonable doubt that the Defendant was sane at the time of the offense (Assignments #9 and #10)."*

Prior to the trial the defendant filed notice of his intention to rely on insanity as a defense pursuant to Neb. Rev. Stat. § 29-2203 (Reissue 1985). This statute provides in pertinent part:

Any person prosecuted for an offense may plead that he . . . is not responsible by reason of insanity at the time of the offense and in such case the burden shall be upon the defendant to prove the defense of not responsible by reason of insanity by a preponderance of the evidence. . . .

Upon the filing of the notice the court, on motion of the state, may order the defendant to be examined at a time and place designated in the order, by one or more qualified experts, appointed by the court, to inquire into the sanity or insanity of the defendant at the time of the commission of the alleged offense.

The defendant contends that § 29-2203 is unconstitutional in that the statute "violates the Due Process Clause, Equal Protection Clause, and Cruel and Unusual Punishment Clause of the Fourteenth and Eighth Amendments to the United States Constitution and Article I, Sections Three, One and Nine of the Nebraska Constitution . . . ." Brief for appellant at 46. The gist of assignments Nos. 9 and 10 is that § 29-2203 unlawfully shifts the burden to the defendant to prove by a preponderance of evidence that he was not responsible by reason of insanity.

The defendant sought to limit his culpability on the grounds that he was not responsible by reason of insanity. The jury was instructed that the State had the burden of proving that the

defendant was guilty beyond a reasonable doubt of the crime charged against him. Section 29-2203 sets out an affirmative defense to the crime of murder and did not require the defendant to disprove any of the elements of the offense with which he was charged.

Defendant cites *Davis v. United States*, 160 U.S. 469, 16 S. Ct. 353, 40 L. Ed. 499 (1895), which held that the United States, in federal court actions, had the burden of proving that a criminal defendant was sane at the time of the offense. Defendant does not direct our attention to the fact that in 1952, the U.S. Supreme Court refused to apply the *Davis* rule, which the Court determined to be "only the rule to be followed in federal courts," to proceedings in the State of Oregon. *Leland v. Oregon*, 343 U.S. 790, 797, 72 S. Ct. 1002, 96 L. Ed. 2d 1302 (1952). In the *Leland* case, the defendant pled not guilty to a charge of first degree murder and gave notice of his intention to rely on insanity as a defense under an Oregon statute which required a criminal defendant to prove his insanity beyond a reasonable doubt. The U.S. Supreme Court upheld the Oregon statute, noting that so long as the presumption of innocence was maintained and the State was required to prove all the elements of the crime charged beyond a reasonable doubt, a defendant could be required to plead and prove the defense of insanity, where defendant presents the defense as an absolute bar to the crime charged. The Nebraska statute is more favorable to a defendant, since the burden of proof under the Nebraska statute is by a preponderance of the evidence rather than beyond a reasonable doubt.

In *Patterson v. New York*, 432 U.S. 197, 205, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977), the Supreme Court reaffirmed the viability of *Leland*, when it stated:

> Subsequently, the Court confirmed that it remained constitutional to burden the defendant with proving his insanity defense when it dismissed, as not raising a substantial federal question, a case in which the appellant specifically challenged the continuing validity of *Leland v. Oregon*. This occurred in *Rivera v. Delaware*, 429 U.S. 877 (1976), an appeal from a Delaware conviction which, in reliance on *Leland*, had been affirmed by the Delaware

Supreme Court over the claim that the Delaware statute was unconstitutional because it burdened the defendant with proving his affirmative defense of insanity by a preponderance of the evidence.

See, also, *Martin v. Ohio,* 480 U.S. 228, 107 S. Ct. 1098, 94 L. Ed. 2d 267 (1987), where the Supreme Court of the United States affirmed a decision of the Ohio Supreme Court holding it was not unconstitutional to place the burden of proving self-defense, in a murder charge, on the defendant. In *State v. Hankins,* 232 Neb. 608, 441 N.W.2d 854 (1989), this court held that § 29-2203 was constitutional. We continue to so hold in this case.

Insofar as defendant contends that § 29-2203 is unconstitutional in view of the provisions of Neb. Const. art. I, §§ 1, 3, and 9, we also determine that § 29-2203 is constitutional.

In *Leland v. Oregon, supra,* and *Patterson v. New York, supra,* the U.S. Supreme Court confirmed that the Oregon and New York statutes, similar to § 29-2203, were constitutional. As stated above, § 29-2203 affords greater protection to a defendant than did Oregon's statute, in that the Nebraska statute places a lesser burden of proof on a defendant. We hold § 29-2203 as constitutional under the Nebraska Constitution.

In the defendant's 10th assignment of error, he contends that § 29-2203 is unconstitutional in that the "shifting of the burden of proof back and forth between the State and the Defendant is so confusing to the jury as to violate the Defendant's Due Process Rights." The defendant fails to cite this court to any authority for this proposition. The contention concerning possible confusion of the jury in determining the distinction between the State's burden of proving premeditation and the other elements of a murder charge and a defendant's burden of proving insanity was also present in the *Leland* case. On that issue, the Court stated:

We think the charge to the jury was as clear as instructions to juries ordinarily are or reasonably can be, and, with respect to the State's burden of proof upon all the elements of the crime, the charge was particularly emphatic. Juries have for centuries made the basic decisions between guilt

and innocence and between criminal responsibility and legal insanity upon the basis of the facts, as revealed by all the evidence, and the law, as explained by instructions detailing the legal distinctions, the placement and weight of the burden of proof, the effect of presumptions, the meaning of intent, etc. We think that to condemn the operation of this system here would be to condemn the system generally. We are not prepared to do so.

*Leland v. Oregon*, 343 U.S. 790, 800, 72 S. Ct. 1002, 96 L. Ed. 2d 1302 (1952). We have reviewed the record and find that the instructions herein fully conform to the standards set out in *Leland*.

Potential jurors were informed during voir dire, and the court's instructions provided, that the State was required to prove beyond a reasonable doubt all the elements of the crime charged. The jury was also instructed that defendant was required to prove by a preponderance of evidence that he was not responsible by reason of insanity.

These two burdens were specifically defined by the court in the general instructions to the jury, and the jury was instructed that the burden of proving all the elements of the crime never shifts from the State. The jury was also instructed as to the presumption of defendant's innocence.

Section 29-2203 is not unconstitutional under the U.S. or Nebraska Constitution, and the instructions in this case did not violate defendant's due process rights. Assignments Nos. 9 and 10 are without merit.

VIII. *"Third parties should not be allowed to circumvent [a] sequestration order (Assignment #11)."*

During the trial, the court ordered that the witnesses be sequestered pursuant to Neb. Rev. Stat. § 27-615 (Reissue 1985). The defendant contends that he was denied due process and his constitutional right to confront the witnesses against him because the State had a psychiatrist present in the courtroom during the trial and that this psychiatrist, Dr. Wingert, advised the prosecution and consulted with Dr. Kenney, a psychiatrist who testified on behalf of the State. The defendant contends that this was a violation of the sequestration order and violated his constitutional rights as set

out above. We do not agree.

After the jury had been excused for lunch on Thursday, April 3, 1986, Dennis Ryan's attorney moved the court for an order to prevent the State's psychiatrist who was testifying at the trial from speaking to the State's psychiatrist who had been present in the courtroom during the trial. The court responded:

THE COURT: I don't think there was any order of sequestration that said that people couldn't talk to each other outside of the courtroom. There just wasn't such an order entered. If you want to show me one, Mr. Rehm, I will be happy to look at it.

MR. REHM [Dennis Ryan's cocounsel]: Well, I think that it's so — If you have a sequestration order, the idea is that you don't want your witnesses, subsequent witnesses, to get —

THE COURT: Mr. Rehm, you've showed depositions to all of your witnesses. What are you talking about?

MR. REHM: I didn't have a psychiatrist sitting in here that talked to the other psychiatrist to tell him what the other doctor said in professional terms. We didn't do that. We haven't had that.

. . . .

THE COURT: Mr. Rehm, you asked for a daily copy, which you were granted, so you could take the testimony from the courtroom and deliver it to your witnesses so they could read it. Now what are you talking about?

. . . .

MR. REHMEIER [the assistant prosecutor]: Dr. Wingert has been present and Dr. Wingert has conferred with Mr. Merz [the prosecutor] and myself and with Dr. Kenney [the State's psychiatrist]. That was the reason to have him in here. The first day that Dr. Wingert was in here, Mr. Rehm knew it and asked me, "Are you going to call that guy as a rebuttal witness?"

I said, "No. He is in here to assist us on the terminology and what is going on in the courtroom." He knew from the very first day that Dr. Wingert ever walked into this courtroom his purpose.

Now he waits and raises this.

Number two, there is no violation of the sequestration rule. We're not going to be calling Dr. Wingert as a witness. There's no difference in me talking to my witness or if I have somebody else sitting here listening on my behalf to help me understand what in the heck is going on so that I can intelligently talk to our psychiatrist.

There are several problems in the discussion of this point. Initially, we are not directed by defendant to any part of the record setting out the terms of the sequestration order, nor does our examination disclose a specific order. We will assume that a general court order as to sequestration of witnesses was made by the court based on § 27-615. The record shows that a motion for mistrial was made and overruled, but defendant does not cite that action of the court as error, but instead alleges that violation of the statute violates his constitutional rights.

The sequestration statute, § 27-615 provides:

At the request of a party the judge shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and he may make the order on his own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of his cause.

As far as the record discloses, there has been no evidence that any witness has heard "the testimony of other witnesses." Further, we note that the record appears to indicate that Dr. Wingert may well have been a natural person designated as a representative of a party not a natural party, the State of Nebraska. Counsel for the State told the court that the presence of Dr. Wingert was essential to the presentation of its case. See § 27-615(2) and (3).

Further, it would appear that defendant waived the presence of Dr. Wingert during portions of the trial. Dennis Ryan's counsel was informed by the prosecutor on the first day Dr. Wingert appeared that Dr. Wingert was not to be called as a witness and that he was present to assist the prosecutors "on the terminology and what is going on in the courtroom." No

objection was raised until Dr. Kenney was halfway into his testimony. The objection was too late.

Defendant has not been deprived of any constitutional rights because of the presence of Dr. Wingert at the trial. See *State v. Jackson*, 231 Neb. 207, 435 N.W.2d 893 (1989). There is no merit in defendant's assignment of error No. 11.

IX. *"To avoid the undue influence of jurors they should be sequestered during trial and deliberations in a capital case (Assignment # 12)."*

The defendant requested that the jury be sequestered throughout the trial and deliberations. The trial court denied the request, but did order the jury sequestered during its deliberations, as required by Neb. Rev. Stat. § 29-2022 (Reissue 1985).

The determination of whether or not a jury should be sequestered during the trial of a criminal case is left to the discretion of the trial court and, absent an abuse of that discretion or evidence of jury tampering or misconduct, that decision will not be reversed on appeal. *State v. Myers*, 205 Neb. 867, 290 N.W.2d 660 (1980). Defendant asks that we overrule *Myers* to the extent that it holds that it is within the trial court's discretion to determine whether the jury should be sequestered during the trial of a capital case.

The defendant does not allege jury misconduct or that he was prejudiced by the trial court's decision not to sequester the jury during the trial. Section 29-2022 provides, in part:

> If the jury are permitted to separate during the trial, they shall be admonished by the court that it is their duty not to converse with or suffer themselves to be addressed by any other person on the subject of the trial, nor to listen to any conversation on the subject; and it is their duty not to form or express an opinion thereon until the cause is finally submitted to them.

In keeping with the legislative mandate that requires this court to review all cases where the death penalty has been imposed, we have reviewed the record and conclude that the trial court did not abuse its discretion and that the defendant was not prejudiced as a result of the trial court's refusal to sequester the jury during the trial. The rule in *Myers* stands.

Defendant's assignment No. 12 is without merit.

X. *"The state must prove that the Defendant intended to kill the victim (Assignment #13)."*

Defendant's assignment No. 13 sets out that the " 'Aider and Abettor' jury instruction created an impermissible presumption which denied the Defendant his rights under the Due Process Clause and Cruel and Unusual Punishment Clause." Defendant's argument heading and his assignment of error lead to the conclusion that defendant is assigning as error the court's giving of instructions Nos. 11 and 13.

The jury was given two instructions on aiding and abetting. Instruction No. 13 reflected NJI 14.12, and provided:

> To be guilty of the crime charged, it is not necessary that the State prove that defendant Michael W. Ryan himself committed the unlawful act or acts in question.
>
> Whoever aids, abets or procures another to commit any offense may be prosecuted and punished as if he were the principal offender.
>
> If you find from the evidence beyond a reasonable doubt that the unlawful act or acts in question were committed by another person who was:
>
> 1. Engaged by defendant Michael W. Ryan to commit the unlawful act or acts, or
>
> 2. Engaged with defendant Michael W. Ryan in a common, concerted unlawful act or acts, or
>
> 3. Incited or encouraged by defendant Michael W. Ryan to commit the unlawful act or acts,
>
> then defendant Michael W. Ryan is as guilty as if he himself committed the unlawful act or acts, and it is your duty to find defendant Michael W. Ryan guilty.
>
> Aiding and abetting involves some participation in the criminal act and must be evidenced by some word, act or deed. No particular acts are necessary; nor is it necessary that any physical part in the commission of the crime is taken or that there was an express agreement therefor. Mere encouragement or assistance is sufficient.
>
> On the other hand, evidence of mere presence, acquiescence, or silence is not enough to sustain the State's burden of proving a defendant guilty.

This instruction accurately describes the statutory requirements of Neb. Rev. Stat. § 28-206 (Reissue 1985), which provides: "A person who aids, abets, procures, or causes another to commit any offense may be prosecuted and punished as if he were the principal offender."

The jury also received instruction No. 11, which provided in part:

> Where a crime requires the existence of a particular intent, an alleged aider or abettor cannot be held as a principal unless it is established that the aider knew that the perpetrator of the act had the required intent, or that the aider himself or herself had the required intent. If the intent of the aider is different from that of the perpetrator, the aider's guilt is measured by the intent that actuated him or her.

In addition, the court instructed the jury as to the intent necessary to be found before the defendant could be convicted of the various degrees of homicide.

The defendant contends that the language of instruction No. 11 "had the effect of letting the jury find the Defendant guilty of First Degree Murder without specifically finding that the Defendant intended to kill." Brief for appellant at 51. Defendant is not correct in this assertion. Instruction No. 11 told the jury that an aider and abettor could not be held as a principal unless he knew the perpetrator had the required intent. The jury was also instructed that an "aider's guilt is measured by the intent that actuated him . . . ." The jury was properly instructed on the law of aiding and abetting, and there was more than sufficient evidence before the jury to support a determination of defendant's guilt of first degree murder. Defendant's assignment No. 13 is without merit.

XI. *"Fundamental fairness demanded the testimony of co-defendants be excluded (Assignment #14)."*

In this assignment of error, defendant does not complain of any specific action of the trial court, but states, "By allowing co-defendants to testify who admittedly had continually lied and guessed under oath, the Court decreased the reliability of the trial so as to violate the Defendant's Due Process rights and subjected him to Cruel and Unusual Punishment."

The conduct of the court complained of in this assignment apparently was the trial court's failure to exclude the testimony of "John Andreas, James Haverkamp, Timothy Haverkamp, and Ora Richard Stice." Brief for appellant at 52. The testimony of Stice will not be considered in this regard, since he was not a codefendant, nor was he an accomplice in the actual murder of James Thimm.

With regard to the testimony of the others named, while they were all accomplices in the murder of Thimm, none of those named were actually codefendants during the trial of defendant and Dennis Ryan. The case filed against Timothy Haverkamp was consolidated at one time with defendant's case, but Timothy Haverkamp pled guilty to second degree murder before defendant's trial and appeared in the trial as a witness for the State. Andreas and James Haverkamp pled guilty to other charges before defendant's trial. The testimony of these witnesses will be discussed as the testimony of accomplices.

This court has long held that an accomplice is competent to testify and that the value of such testimony is for the jury. *State v. Sneff*, 22 Neb. 481, 35 N.W. 219 (1887). We have held that a criminal conviction may be based upon the uncorroborated statements of an accomplice. *State v. Burchett*, 224 Neb. 444, 399 N.W.2d 258 (1986); *State v. Huffman*, 222 Neb. 512, 385 N.W.2d 85 (1986).

The jury was given the following instruction:

> The State has adduced testimony from claimed accomplices. Their testimony should be closely scrutinized for any possible motives for falsification, and if you find that any of them has testified falsely in regard to any material matter, you should be hesitant to convict upon his testimony without corroboration, and in no case should you convict a defendant unless you are satisfied of his guilt from all the evidence beyond a reasonable doubt.

The defendant contends that James Haverkamp "admitted to one lie after another, to guessing instead of telling the truth and to fabricating testimony to protect himself and others." Brief for appellant at 57. Where the jury has been properly instructed that testimony of an accomplice should be scrutinized closely for possible motives of falsification, the

uncorroborated testimony of an accomplice who has given false testimony concerning a material matter may be sufficient to sustain a conviction. *State v. Smith*, 219 Neb. 176, 361 N.W.2d 532 (1985). In the cause before us, the evidence in the record, including defendant's own testimony, shows that the evidence of defendant's guilt was overwhelming.

The trial court properly instructed the jury, and the evidence was sufficient to support the jury's finding. The testimony of Andreas, James Haverkamp, and Timothy Haverkamp was properly before the jury, and it was for the jury to decide what weight to attach to their testimony. Defendant's assignment of error No. 14 is without merit.

XII. *"There was insufficient evidence for the jury to find beyond a reasonable doubt that the Defendant intended to kill the victim (Assignment #15)."*

Defendant's 15th assignment alleges: "There was insufficient evidence to prove the Defendant guilty of the killing of James Thimm. The jury also erred by not finding the Defendant met his burden on the question of his insanity." With regard to the contention that there was insufficient evidence presented at the trial to warrant his conviction for first degree murder, we have said above that the evidence was overwhelming. The defendant testified at the trial. During this testimony the defendant admitted that he was the leader of the group and admitted that he gave orders to torture Thimm. The events of the torture and death were presented in nauseating detail. The defendant also admitted to having used the arm test through Lisa Haverkamp in order to determine when Thimm was to die. The record also shows that Ryan had Thimm sign the title of his vehicle over to Timothy Haverkamp. All the evidence clearly indicated that the defendant intended to take Thimm's life. Defendant's contention in this regard is frivolous.

The defendant also asks this court to find as a matter of law that he was insane under the provisions of § 29-2203 and lacked the requisite mental state to be able to form the intent necessary to be convicted of first degree murder. The statute explicitly leaves this determination to the jury.

The record demonstrates that there was ample evidence before the jury to support a finding that the defendant was

legally sane at the time of James Thimm's murder. The defendant was examined by Maurice K. Temerlin, Ph.D., a clinical psychologist, who testified on defendant's behalf. Dr. Temerlin testified that in his opinion the defendant was a paranoid schizophrenic. Dr. Temerlin supported his opinion with the following statement:

> My opinion is that [the defendant] was so lost in Wickstrom's teachings and had been so — his mind so distorted by Wickstrom's teachings and by his own individual psychology and the crazy environment in which he lived, that he did not know what he was doing, or did not understand the consequences of it. I think he thought that he was doing what Yahweh wanted him to do, to punish sinners. And to him, given the disorganized, nonrational state that I think his mind was in, he was doing a virtuous deed.

The defendant was also examined by James K. Cole, Ph.D., a clinical psychologist. Dr. Cole testified that there was no evidence that the defendant was suffering from schizophrenia at the time of Thimm's murder. Dr. Cole also testified that there was no evidence that the defendant was suffering from any type of psychosis.

Emmett Kenney, M.D., a psychiatrist, also examined the defendant and testified on behalf of the State. Dr. Kenney testified that there was no evidence that the defendant was suffering from an organic brain syndrome or psychosis and that the defendant was capable of understanding the nature and quality of his acts during the time Thimm was being tortured. Kenney also testified that he did not believe that the defendant suffered from paranoid schizophrenia, that the defendant had a sufficient mental capacity to turn the matter over in his mind, and that the defendant intended the obvious and probable consequences of his actions. Kenney testified that defendant "had sufficient capacity to understand the rightness or the wrongness of his acts" and that "he did know that the acts were wrong and were deserving of punishment." Kenney also testified that the Rulo group was "an eccentric family or . . . an adult criminal gang."

It was on this evidence that the jury concluded that the

defendant was sane. The credibility and weight to be given testimony is a matter for the evaluation and determination of the jury. *State v. Williams*, 224 Neb. 114, 396 N.W.2d 114 (1986). The defense of insanity when interposed by an accused is a question of fact for the jury. *Philbrick v. State*, 105 Neb. 120, 179 N.W. 398 (1920). The verdict of the finder of fact on the issue of insanity will not be disturbed unless there is insufficient evidence to support such a finding. *State v. Russell*, 194 Neb. 64, 230 N.W.2d 196 (1975); *State v. Klatt*, 187 Neb. 274, 188 N.W.2d 821 (1971); *State v. Newson*, 183 Neb. 750, 164 N.W.2d 211 (1969).

In determining whether the evidence before a jury was sufficient to support the jury's finding, this court does not resolve conflicts of evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh evidence presented to the jury, for these are within the jury's province for disposition, and a jury's verdict must be sustained if evidence, viewed and construed most favorably to the State, is sufficient to support that verdict. *State v. LynCook*, 227 Neb. 719, 419 N.W.2d 686 (1988); *State v. Lane*, 227 Neb. 687, 419 N.W.2d 666 (1988).

The issue of defendant's sanity was fairly presented and decided by the jury, and we will not disturb that decision on appeal. Defendant's assignment of error in this regard is without merit.

XIII. "*Judicial misconduct and failure of the Court to disqualify itself at sentencing denied Defendant a fair and impartial sentencing tribunal (Assignments #16 and #17).*"

Rather than an assignment of error, in his assignment No. 16 defendant has stated what he considers a fact determinative of his statement that he has been denied due process, apparently during the guilt-innocence part of the trial. In his assignment No. 17, defendant straightforwardly sets out that the trial judge erred "in failing to disqualify [himself] at the penalty phase" of the trial and in support of that contention sets out events occurring during the trial. We shall treat assignment No. 16 as if defendant is contending that the trial judge erred in failing to disqualify himself from presiding at the trial. As presented in defendant's brief, the two points are argued together, and we

will so consider them.

This court, long ago, set out the standards as to conduct during a trial to which a trial judge must conform in order to provide a defendant a fair trial. In *Hansen v. State*, 141 Neb. 278, 286-87, 3 N.W.2d 441, 446 (1942), we said:

"It is the duty of the court to abstain carefully from any expression of opinion or comment on the facts or evidence, not only in its charge to the jury . . . but also on the examination of witnesses and otherwise during the course of the trial. The trial judge should not deny the existence of any fact bearing on the innocence of accused, or make any remark or inquiry in the presence of the jury concerning matters of fact at issue which indicates his opinion as to such facts." . . .

". . . It is well known to those who are familiar with jury trials that jurors are usually alert to discover the attitude of the court respecting the merits of the case, and particularly in criminal actions. For this reason, among others, the court should avoid even the appearance of partiality as between the parties. . . ."

See, also, *Moore v. State*, 147 Neb. 390, 23 N.W.2d 552 (1946); *State v. Bideaux*, 219 Neb. 718, 365 N.W.2d 830 (1985); *State v. Larmond*, 244 N.W.2d 233 (Iowa 1976).

The cases we have cited are concerned primarily with statements made by the trial judge, but it is axiomatic that conduct can speak as loudly as words. The trial judge in this case, by his conduct, has expressed himself to some degree. We must consider whether that conduct has prejudiced defendant's right to a fair trial.

The facts set out by defendant on these issues are the following.

During the sentencing hearing held on September 15, 1986, the defendant's attorney asked the trial judge

to say something about the meeting in chambers when we were here for sentencing on the second degree murder charge. [The defendant pled nolo contendere on July 28, 1986, to the second degree murder of Luke Stice and was sentenced to life imprisonment for this murder on September 11, 1986.] The meeting in chambers,

apparently, between the court and to some extent, Mr. Merz [the prosecuting attorney], with — with persons interested in the Luke Stice matter.

THE COURT: Okay. Well, for the record and for your information, Mr. Goos and Mr. Ryan, the Court has, after each — at the conclusion of each case, asked the family members of the victims if they would like to visit with the Court, and if so, answer certain questions about legal proceedings that might have gone on during the course of the trial. And a number of the family members did want to visit with the Court and, basically, the subject of that visit was to answer — All right, Mr. Merz, first of all, wasn't there except for — I asked him to explain one thing to them. And, basically, it was just to answer questions about the proceedings that went on pertaining to that case. *There was absolutely no discussion about any other cases other than that case. . . .*

. . . .

. . . The Court didn't have any inquiries it wanted to make of the family. The only thing the Court wanted to do was make itself available to the family to answer any questions about any procedural matters; legally — legal procedural matters that might have been confusing to them, 'cause we're quite frequently getting criticized that —that no one ever shows any consideration of the victims by at least being willing to answer questions. And I asked Mr. Merz to come in and answer a question that they had, and to be right honest with you, I — Do you recall what that was? It had to do with the plea bargain, I believe.

MR. MERZ: Well, Your Honor, the substance of the question was, frankly, what was the legal effect of the no contest or the nolo contendere plea.

THE COURT: Yeah, that's right. So, that question was raised to, you know, what is the legal consequences of a — or, significance or meaning of a no contest plea . . . .

(Emphasis supplied.)

In *State v. Barker*, 227 Neb. 842, 847, 420 N.W.2d 695, 699 (1988), we held: "[A] judge, who initiates or invites and receives an ex parte communication concerning a pending or impending

proceeding, must recuse himself or herself from the proceedings when a litigant requests such recusal." See, also, *State v. Jenson*, 232 Neb. 403, 440 N.W.2d 686 (1989).

Initially, we must determine whether the trial judge violated this rule. It is true that the trial judge stated he had invited an ex parte communication with "the family members of the victims." The law does not condone such a practice. The record does not show, however, that the trial judge met with the James Thimm family, and the judge affirmatively stated, "There was absolutely no discussion about any other cases than that [Luke Stice] case." There is nothing in the record indicating anything to the contrary.

The trial judge did meet with the Luke Stice family before defendant was sentenced on his plea of nolo contendere to the second degree murder of Luke Stice, and so stated in the case before us. In that connection, the trial court acted as a witness within the holding set out in *State v. Barker, supra*. The propriety of the court's actions in the Stice murder case is not before this court in this case. Any communication the judge had with the Stice family cannot be said to have concerned the pending or impending proceeding before the trial court and this court in this case, the murder of James Thimm, in connection with either the sentencing of defendant or the conduct of the trial.

Additionally, the sentencing court did not consider the Luke Stice murder as an aggravating circumstance under Neb. Rev. Stat. § 29-2523(1)(a) (Reissue 1985). This subsection provides: "The offender was previously convicted of another murder or a crime involving the use or threat of violence to the person, or has a substantial history of serious assaultive or terrorizing criminal activity."

We held in *State v. Joubert*, 224 Neb. 411, 399 N.W.2d 237 (1986), and *State v. Moore*, 210 Neb. 457, 316 N.W.2d 33 (1982), that this circumstance exists where the defendant had killed someone prior to the murder for which he was sentenced to death.

The rule set forth in *Barker, supra*, does not apply to the case at bar, given the fact that the ex parte meeting did not concern a pending case, and the murder of Luke Stice was not considered

under circumstance (1)(a) by the judge in sentencing the defendant.

In his 17th assignment of error the defendant contends that he was prejudiced before the jury when the trial judge turned his back to the defendant "during at least half of [the defendant's] testimony." Brief for appellant at 59. During a hearing on a motion for a new trial the trial judge stated to defendant's attorney:

> Let me get your advice for the next trial, would you rather that when testimony's coming in about a shovel handle going up somebody's rectum and it just, you know, kind of smarts a little bit, would you rather I do that facing the jury, or would you rather I do that with my back to the jury?

The trial judge apparently has admitted the conduct alleged by defendant on this point. The fact that the trial judge turned away from the defendant in an attempt to hide his expressions from the jury while the defendant described, in detail, the atrocities of his crime was inappropriate, but does not constitute prejudicial error in this case. There are cases when such conduct by a judge might constitute prejudicial error in a criminal trial, but in this case, where the evidence of defendant's guilt is so overwhelming, we hold that the trial judge's actions did not constitute reversible error. It would have been better had the judge observed all witnesses while they testified about the sickening events, as the jury was required to do, but the judge's conduct does not constitute prejudicial error in this case.

If it be considered that defendant is attacking the judge's conduct as affecting the guilt-innocence portion of the trial, there are separate reasons why that conduct does not require reversal of this cause on that issue.

With regard to the Luke Stice matter, any communications with the Stice family occurred after the case had been submitted to the jury and the jury had determined defendant guilty of first degree murder. The activities in this regard could not have affected the jury verdict in any way.

With regard to the judge's actions during defendant's testimony, we cannot find in the record, nor are we directed to any portion of the record, where defendant objected to the

judge's actions. The incident was not mentioned until defendant filed a motion for new trial after the verdict. It is not possible for this court to now judge the effect of the judge's turning his back on defendant while he was testifying, but defendant may not let that occur and then, after the verdict, complain of the conduct. We are not faced with the situation in *State v. Larmond*, 244 N.W.2d 233 (Iowa 1976), where the Iowa court was faced with the further problem that defendant's counsel was inexperienced. Defendant's counsel in this case was experienced and, as the record shows, was not at all reticent in representing defendant.

Insofar as defendant contends the trial judge's activities affected the sentencing procedure, that issue will be discussed later in this opinion.

Defendant's 16th and 17th assignments of error are without merit.

XIV. *"It is error for the sentencing judge not to convene a three-judge panel when requested by the Defendant (Assignments #18, #19, & #20)."*

The defendant contends that § 29-2520 is unconstitutional, since it grants the trial judge discretion in determining whether a three-judge sentencing panel will preside over the sentencing of a defendant charged with a capital crime. We have held that the sentencing procedure provided by § 29-2520 does not violate either the Nebraska or federal Constitution. *State v. Simants*, 197 Neb. 549, 250 N.W.2d 881 (1977).

As we noted in *State v. Stewart*, 197 Neb. 497, 250 N.W.2d 849 (1977), the State of Florida has a statute similar to § 29-2520. This statute, Fla. Stat. Ann. § 921.141 (West 1985), provides:

> Upon conviction or adjudication of guilt of a defendant of a capital felony, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death or life imprisonment . . . . The proceeding shall be conducted by the trial judge before the trial jury . . . .
>
> . . . After hearing all of the evidence, the jury shall deliberate and render an advisory sentence to the court . . . .

> . . . Notwithstanding the recommendation of a majority of the jury, the court, after weighing the aggravating and mitigating circumstances, shall enter a sentence of life imprisonment or death . . . .

This statute was challenged on constitutional grounds in *Proffitt v. Florida*, 428 U.S. 242, 96 S. Ct. 960, 49 L. Ed. 2d 913 (1976). We quoted from *Proffitt* in *State v. Simants, supra* at 558, 250 N.W.2d at 887:

> "[I]t would appear that judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases."

The Nebraska statute, § 29-2520, provides for the sentencing determination to be made by:

> (1) The judge who presided at the trial or who accepted the plea of guilty; (2) a panel of three judges including the judge who presided or accepted the plea, the two additional judges having been designated by the Chief Justice of the Supreme Court after receiving a request therefor from the presiding judge; or (3) a panel of three district judges named by the Chief Justice of the Supreme Court when such Chief Justice has determined that the presiding judge is disabled or disqualified after receiving a suggestion of such disability or disqualification from the clerk of the court in which the finding of guilty was entered.

This statute does grant the trial judge discretion in that he or she may opt to conduct the sentencing with or without the assistance of two additional judges. However, this discretion cannot be said to be constitutionally infirm where the U.S. Supreme Court has held that a single judge presiding at a defendant's trial may conduct and decide the sentencing phase of a capital case. *Hildwin v. Florida*, ____ U.S. ____, 109 S. Ct. 2055, 104 L. Ed. 2d 728 (1989); *Spaziano v. Florida*, 468 U.S. 447, 104 S. Ct. 3154, 82 L. Ed. 2d 340 (1984).

The U.S. Supreme Court has refused to select a single best method for a state to conduct capital sentencing. *Spaziano,*

*supra.* See, also, *Pulley v. Harris,* 465 U.S. 37, 104 S. Ct. 871, 79 L. Ed. 2d 871 (1984); *Zant v. Stephens,* 462 U.S. 862, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983); *Gregg v. Georgia,* 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976).

There are currently 37 states with death penalty statutes. Twenty-nine of these states have statutes that allow a death sentence only after a jury recommends such a sentence. Three of these states allow a judge to override the jury's recommendation. Ala. Code § 13A-5-46 (1982); Fla. Stat. Ann. § 921.141 (West 1985 & Supp. 1989); Ind. Code § 35-50-2-9 (Supp. 1988). Nevada requires a three-judge panel to impose sentence only if the jury cannot agree. Nev. Rev. Stat. §§ 175.554 and 175.556 (1987). Of the remaining four states, of which Nebraska is one, the sentencing determination in a capital case is made by a judge without a jury. Ariz. Rev. Stat. Ann. § 13-703 (Supp. 1988); Idaho Code § 19-2515 (1987); Mont. Code. Ann. § 46-18-301 (1987); Neb. Rev. Stat. § 29-2520 (Reissue 1985). After reviewing these statutes and the cases interpreting them, we are convinced that the Nebraska Legislature has provided a sentencing method that is fair and sensitive to a capital defendant and satisfies the requirements of the U.S. and Nebraska Constitutions. The Nebraska statute ensures the death penalty will not be imposed arbitrarily or discriminatorily.

Defendant argues that where a defendant has requested a three-judge sentencing panel, such a panel should be mandatory. We disagree. The statute clearly places the discretion with the trial judge, and this grant of discretion is neither unreasonable nor constitutionally infirm.

Pursuant to Neb. Rev. Stat. § 29-2521.03 (Reissue 1985), this court is charged with a review to determine the propriety of the death sentence in a case in which it has been imposed by comparing the sentence with previous cases involving the same or similar circumstances. *State v. Joubert,* 224 Neb. 411, 399 N.W.2d 237 (1986). We have compared this case with previous cases in which the death penalty has been imposed under § 29-2520. We do not find any evidence in the record indicating the defendant was prejudiced by the trial judge's refusal to request the designation of a three-judge sentencing panel.

The determination of whether to request the designation of a three-judge sentencing panel under § 29-2520 is left to the discretion of the district court, and absent a showing of an abuse of that discretion, this court, on appeal, will affirm that decision. Defendant's 18th, 19th, and 20th assignments of error are without merit.

XV. *"Defendant's sentence was unconstitutionally imposed because he was denied a jury trial on the facts that comprise the ingredients of his offense (Assignment #21)."*

The defendant argues that Neb. Rev. Stat. § 29-2522 (Reissue 1985) is unconstitutional in that it denies a criminal defendant the right to have a jury determine the factual issues comprising the condemned criminal act. This contention has been determined adversely to defendant's position.

The U.S. Supreme Court held in *Hildwin v. Florida, supra* at 109 S. Ct. at 2057:

> [T]he requirement that the [capital sentencing] findings be made by a judge rather than the jury did not violate the Sixth Amendment because "there is no Sixth Amendment right to jury sentencing, even where the sentence turns on specific findings of fact." [Quoting *McMillan v. Pennsylvania*, 477 U.S. 79, 106 S. Ct. 2411, 91 L. Ed. 2d 67 (1986).] Like the visible possession of a firearm in *McMillan*, the existence of an aggravating factor here is not an element of the offense but instead is "a sentencing factor that comes into play only after the defendant has been found guilty." *Id.*, at 86, 106 S.Ct., at 2417. Accordingly, the Sixth Amendment does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury.

See, also, *State v. Reeves*, 216 Neb. 206, 344 N.W.2d 433 (1984). Assignment No. 21 is without merit.

XVI. *"Without an affirmative showing on the record that Miranda type warnings have been given to the Defendant prior to an examination by the state's psychiatrist the psychiatrist should be precluded from testifying at the penalty hearing (Assignments #22 and #23)."*

In his assignment No. 22, defendant states that "[b]y the introduction of the State's psychiatrist's testimony at the

sentencing stage without the State giving the Defendant *Miranda* type warnings prior to the psychiatrist's interview of the Defendant, the Defendant's constitutional protection against self-incrimination were [sic] violated."

On this point, defendant sets out no specific action of the trial court which he challenges in this regard. Apparently, defendant is assigning as error the failure of the trial court to sustain his objection to the use of the trial testimony of the State's psychiatrist, Dr. Kenney, at the sentencing.

Assignment No. 23 is another general statement that defendant was denied due process and effective counsel because he did not receive "advanced notice of the intended use of the psychiatric exam by the State"—apparently at the penalty phase of the trial. Again, there is no assignment of error in any specific action of the trial court, but we assume the error complained of is the court's consideration of Dr. Kenney's trial testimony during the penalty phase, when defendant had not been given *Miranda* warnings prior to a psychiatric examination which had been ordered after the defendant gave notice of his intention to rely on an insanity defense.

Defendant cites this court to *Estelle v. Smith*, 451 U.S. 454, 101 S. Ct. 1866, 68 L. Ed. 2d 359 (1981), wherein the court ordered a psychiatric examination of defendant. Smith was examined by a court-appointed psychiatrist pursuant to a court order, which the trial judge had entered sua sponte, to determine the issue of Smith's competency to stand trial. After the trial, Smith was found guilty of murder by a jury. At a separate sentencing hearing after Smith had been found guilty by the jury, this same psychiatrist, who was not listed as a witness, testified on behalf of the State, over Smith's objections, on the question of defendant's future dangerousness. The Supreme Court summed up the case when it stated: "The state trial judge, *sua sponte*, ordered a psychiatric evaluation of respondent for the limited, neutral purpose of determining his competency to stand trial, but the results of that inquiry were used by the State for a much broader objective that was plainly adverse to respondent." 451 U.S. at 465. On these facts, the U.S. Supreme Court held: "A criminal defendant, who neither initiates a psychiatric evaluation nor

attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." 451 U.S. at 468.

This ruling is not applicable to cases where a defendant has put his sanity into issue. In this case, defendant put at issue his sanity, as a defense to the charge of first degree murder. He apparently contends that the question of defendant's insanity must be decided twice—at the trial of the guilt or innocence of defendant and at the penalty hearing—and that evidence at the trial should not be considered at the penalty phase.

At the jury trial on the issue of defendant's innocence or guilt, a psychiatrist testified on defendant's behalf.

At the penalty phase of the trial, the same psychiatrist testified that at the time of the murder of James Thimm, defendant was acting under "unusual influences." In answer to the question "do you feel that he was under the influence of any extreme mental or emotional disturbance," this witness answered: "[I]f that phrase includes what we would term being actively psychotic or being delusional with regards to the events that were going on at the time, the answer would be yes." This witness also testified, in answer to the question, "What about his capacity to appreciate the wrongfulness of his conduct, or to conform his conduct to the requirements of law?" as follows:

> A Well, certainly he, personally, did not view what happened to James Thimm as wrong, but as something commanded by God and as something he was obligated to obey. In terms of his ability to control his behavior, to the extent that his behavior is — is guided by a persons thought process, and his, regarding that issue, was — was clearly delusional. His behavior was not under the influence of any kind of cognitive control.

These answers were obviously a part of defendant's evidence to show that mitigating circumstances (b), (c), and (g) of § 29-2523(2) were proved by defendant by the evidence before the court on the penalty phase. These answers were based on the examination the witness had made of the defendant in connection with the insanity defense filed on behalf of the defendant. After the psychiatrist had testified at the penalty

phase, the defendant testified on his own behalf.

At the conclusion of the defendant's testimony, Emmett Kenney, M.D., a psychiatrist, testified in rebuttal for the State. During the guilt-innocence phase Dr. Kenney testified that he had examined the defendant at his office in Omaha under the following circumstances:

> I introduced myself, explained my particular role, explained that it was not a standard psychiatric interview in that it was not confidential, explained that the other way in which it was not customary was that there was a tape-recorder present on the desk. I asked him to speak loudly . . . and explained that the tape-recording was there at the request of his attorney.

It is obvious from this uncontroverted testimony that the defendant was advised that anything he told Dr. Kenney would not be kept confidential and that defendant's counsel was fully aware of the psychiatric interview in that the examination was being recorded for the defendant's attorney. The rule set forth in *Estelle v. Smith*, 451 U.S. 454, 101 S. Ct. 1866, 68 L. Ed. 2d 359 (1981), does not apply under these circumstances.

In *Buchanan v. Kentucky*, 483 U.S. 402, 404, 107 S. Ct. 2906, 97 L. Ed. 2d 336 (1987), one of the questions determined by the Supreme Court was

> whether the admission of findings from a psychiatric examination of petitioner proffered solely to rebut other psychological evidence presented by petitioner violated his Fifth and Sixth Amendment rights where his counsel had requested the examination and where petitioner attempted to establish at trial a mental-status defense.

In the case before us, defendant and his counsel had, in effect, requested or authorized a psychiatric examination by a State's expert when the defense of insanity was raised under § 29-2203. Further, defendant was attempting to establish at trial, and at the sentencing hearing, a "mental-status defense."

The Supreme Court has held that, in such circumstances,

> [s]uch consultation, to be effective, must be based on counsel's being informed about the scope and nature of the proceeding. There is no question that petitioner's counsel had this information. To be sure, the effectiveness

of the consultation also would depend on counsel's awareness of the possible uses to which petitioner's statements in the proceeding could be put. Given our decision in *Smith*, however, counsel was certainly on notice that if, as appears to be the case, he intended to put on a "mental status" defense for petitioner, he would have to anticipate the use of psychological evidence by the prosecution in rebuttal.

483 U.S. at 424-25.

In this case, defendant's challenge to the testimony of Dr. Kenney at the sentencing hearing is without merit. Defendant's contention that Dr. Kenney's trial testimony should not have been considered at the penalty phase is discussed in the following argument. Defendant's assignments of error Nos. 22 and 23 are without merit.

XVII. *"Introduction of entire trial record by the state at the sentencing phase was error (Assignments #24, #25, #26, #27, #28, and #29."*

Defendant has summarized his assignments of error Nos. 24 through 29 in the heading to his argument XVII. We shall assume that in those assignments of error, defendant is assigning an error which may be summarized as alleging that the trial court erred in receiving the evidence at the trial in the sentencing portion of the trial because, by such action, defendant was denied his right to confront the witnesses against him.

We first note that a motion by the prosecutor that the court take judicial notice "of the trial record in these proceedings" and the court's oral finding that he would take such judicial notice are inappropriate. An entire trial record cannot be said to fall within the definition of a judicially noted fact as set out in Neb. Rev. Stat. § 27-201(2) (Reissue 1985). Nonetheless, for reasons set out below the trial court was entitled to consider the evidence adduced at trial during the sentencing phase.

In its sentencing order, the court did make factual findings based on evidence received during the guilt-innocence phase of the trial. It is clear that the court did not err in the respects claimed by defendant and, indeed, that the assignments in this regard are frivolous. First of all, Neb. Rev. Stat. § 29-2521

(Reissue 1985) provides in part:

> In the proceeding for determination of sentence, evidence may be presented as to any matter that the court deems relevant to sentence, and shall include matters relating to any of the aggravating or mitigating circumstances set forth in section 29-2523. Any such evidence which the court deems to have probative value may be received.

Also, § 29-2522(3) provides in part:

> In each case in which the court imposes the death sentence, the determination of the court shall be in writing and shall be supported by written findings of fact based upon the records of the trial and the sentencing proceeding, and referring to the aggravating and mitigating circumstances involved in its determination.

This section clearly allows the sentencing body to consider evidence adduced at trial to support findings of aggravating and mitigating circumstances.

Further, in *State v. Anderson and Hochstein*, 207 Neb. 51, 72, 296 N.W.2d 440, 453 (1980), *cert. denied* 450 U.S. 1025, 101 S. Ct. 1731, 68 L. Ed. 219 (1981), we said:

> We are unable to find any requirement in the law that a sentencing court may consider only information adduced at trial when exercising discretion in imposing sentence. Likewise, we find no constitutional requirement to permit one convicted the right to confront all who might give information to be used by the sentencing court. Such a requirement goes far beyond any constitutional mandate.

As can be seen, this court implicitly held that a trial court can, at a minimum, consider evidence adduced at the trial at the sentencing phase of a capital case. See, also, *State v. Williams*, 217 Neb. 539, 352 N.W.2d 538 (1984). Defendant's assignments Nos. 25 through 29 are without merit.

XVIII. *"Deposition of a Co-defendant should not be introduced at sentencing hearing even if Co-defendant refuses to testify (Assignments #30, #31, and #32)."*

Defendant assigns as error the sentencing judge's action in permitting into evidence the deposition of Timothy Haverkamp at the defendant's sentencing hearing after Timothy

Haverkamp refused to testify at the hearing. Among other allegations, defendant contends he was denied his right of confrontation. This contention is frivolous.

The trial court did not commit reversible error in allowing the deposition of Timothy Haverkamp in evidence at the sentencing phase of the trial. The testimony Timothy Haverkamp gave at trial was substantially the same as, if not identical to, the testimony contained in his deposition.

The admission of this deposition was merely cumulative, since the trial court record was already before the sentencing court as disclosed above. At the trial, Timothy Haverkamp was cross-examined extensively by the defendant's attorney. Timothy Haverkamp's testimony on direct examination at the trial encompasses 87 pages of the record, and there are 99 additional pages of cross-examination.

Defendant was not prejudiced by the trial court's admission of Timothy Haverkamp's deposition during the sentencing phase.

XIX. *"Defendant is entitled to receive advanced notice of aggravating facts on which the state will rely at sentencing (Assignment #33)."*

Prior to the sentencing phase the defendant filed a motion requesting that the State provide the defendant with the evidence it intended to utilize during the sentencing hearing. This motion was sustained by the court. The defendant argues that since the record does not affirmatively show that this information was provided to the defendant, he was denied his constitutional right to be "informed of the nature and cause of the accusation against him . . . ." Brief for appellant at 75-76. We disagree. Without some affirmative showing in the record that a grant of a motion for discovery was violated, this court will presume compliance. No such violation was ever directed to the attention of the trial court. We need not discuss the matter further. Defendant's assignment of error No. 33 is without merit.

XX. *"The Court must find the facts upon which an aggravating circumstance relies beyond a reasonable doubt (Assignments #34 and #35)."*

In these two assignments defendant again makes general

statements without specifying what action of the trial court constituted error. We, of course, agree that the facts upon which the applicability of an aggravating factor depends must be proved beyond a reasonable doubt. *State v. Rust*, 197 Neb. 528, 250 N.W.2d 867 (1977).

As we understand the thrust of defendant's assignment of error No. 34, defendant contends that in considering the applicability of § 29-2523(1)(d), the court made a finding in subsection (i) of paragraph 4 of its sentencing that "[t]here is also some evidence that Michael W. Ryan either removed or amputated James Thimm's penis and testicles or directed that this be done by others" and that this finding, by its own terms, has found this fact by less than the standard of "beyond a reasonable doubt."

We fully agree with defendant's statement that this finding, if it was a finding, was not supported by sufficient evidence and should not have been made. The trial court itself did note, however, that there was only "some evidence," and apparently did not consider this factor in its ultimate determination.

We cannot agree with defendant's conclusion, however, that "[i]f the Court on this one identifiable instance found facts by the wrong standards, it must be assumed that the Court was using the wrong standard on all or a part of the other findings of fact throughout the Order." Brief for appellant at 76. Such a leap in logic is not required as a matter of law by this court. The particular statement of fact referred to above is not supported by the evidence; the trial court so stated; and we have so stated. The reference to possible penis amputation was made by the State's pathologist in his testimony concerning the autopsy, but that same pathologist, in other testimony, argues that the disfiguration is probably the result of decomposition.

That does not control the outcome of this particular assignment of error. The ultimate finding made in connection with this particular challenged finding was that "[t]he court concludes and finds beyond a reasonable doubt this aggravating circumstance [the murder was especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence. § 29-2523(1)(d)] exists in this case."

In support of that finding, the court lists 10 other specific acts which the court found had been proved beyond a reasonable doubt. Among those specific findings were:

    a) The death of James Thimm occurred over several days while James Thimm was tied and chained in a hog confinement shed;

    b) Michael W. Ryan on numerous occasions sodomized James Thimm with a shovel handle and directed others to do the same;

    . . . .

    e) Michael W. Ryan skinned James Thimm while he was alive . . . .

Our examination of the record shows that all of the other specific facts related by the trial court were established by evidence beyond a reasonable doubt. Defendant does not specifically challenge any of the other findings on this issue. The findings of the trial court in this regard do not constitute prejudicial error to defendant.

In his 35th assignment of error defendant contends that "[b]y the Court inventing its own aggravating circumstances," defendant has been deprived of various constitutional rights. Defendant's brief seems to contend that ordering other people, subject to defendant's full control as in this case, to do evil acts is somehow different from defendant's performing the evil acts himself. That cannot be.

Defendant's assignments Nos. 34 and 35 are without merit.

XXI. *"Double counting of the facts supporting aggravating circumstances is impermissible (Assignment #36)."*

Defendant also contends that the sentencing court counted certain factors twice in determining aggravating circumstances found in § 29-2523(1)(a) and (d). We held in *State v. Rust, supra* at 538, 250 N.W.2d at 874:

We think it is not reasonable to construe the definitions [of the aggravating circumstances in § 29-2523] in such a manner as to make them overlap and make the same identical facts constitute two aggravating circumstances.

We believe the Legislature intended by each definition to convey a different concept, at least to the extent that some added different and important element . . . is

included in each separate definition even though some fact or facts in a particular case may pertain to more than one of the definitions . . . .

This standard was complied with by the sentencing court. In his brief, the defendant contends the following facts were used to support a finding of both aggravating factors (1)(a) and (1)(d). In support of (1)(a) the court noted that the "defendant assaulted both Richard Stice and James Thimm leading up to, and prior to the time of, the events involving the death of James Thimm." In support of (1)(d) the sentencing court noted that the defendant "caused James Thimm to suffer further humiliation by directing him to perform homosexual acts with another member of the group." There is evidence in the record to support both of these statements. The record shows that the defendant struck and beat both Stice and Thimm. There was also evidence that the defendant forced James Thimm to engage in homosexual activity. These incidents were distinct and involved different testimony. The ruling in *State v. Rust*, 197 Neb. 528, 250 N.W.2d 867 (1977), prevents a sentencing court from using the same evidence to support different aggravating factors. It does not prevent a sentencing court from considering evidence of distinct incidents to support different aggravating factors. Defendant's assignment No. 36 is without merit.

XXII. *"Circumstance 1(a) is vague and overbroad and thus unconstitutional (Assignments #37 and #38)."*

Section 29-2523(1)(a) provides as follows: "The offender was previously convicted of another murder or a crime involving the use or threat of violence to the person, or has a substantial history of serious assaultive or terrorizing criminal activity."

We have narrowed our interpretation of this statute as this court has been required to review its application. In *State v. Stewart*, 197 Neb. 497, 250 N.W.2d 849 (1977), we held that aggravating circumstance (1)(a) did not exist where the defendant has no prior criminal record. We stated in *Stewart* that "(1)(a) should be applied only to criminal activity conducted prior to the events out of which the charge of murder arose." *Id*. at 520, 250 N.W.2d at 863.

In *State v. Rust, supra,* we determined that aggravating circumstances (1)(a) applied where the defendant had a prior conviction for assault with intent to inflict great bodily harm, and we stated: "We interpret *'substantial history* of serious assaultive or terrorizing criminal activity' to refer to events and incidents prior to and not part of the events out of which the current charge arises. The use of the term 'history' clearly implies earlier events." (Emphasis in original.) *Id.* at 535, 250 N.W.2d at 872-73.

In *State v. Holtan,* 197 Neb. 544, 250 N.W.2d 876 (1977), we found the existence of circumstance (1)(a) where the defendant had convictions for armed robbery and first-degree assault and three convictions for bank robbery. We stated in *Holtan*:

> The words "serious," "assaultive," and "terrorizing" are words in common usage with meanings well-fixed and generally clearly understood. The term "substantial history" is likewise reasonably clear. "History" refers to the individual's past acts preceding the incident for which he is on trial and "substantial," as here used, refers to an actual, material, and important history of acts of terror of a criminal nature. It does not refer to the particular incident involving the homicide for which he is subject to sentence.

*Id.* at 546, 250 N.W.2d at 879.

In *State v. Peery,* 199 Neb. 656, 261 N.W.2d 95 (1977), we upheld a finding of aggravating circumstance (1)(a) where the defendant had the following record: (1) felony escape involving forcible detainer and robbery of a jailer, (2) armed robbery of a service station, (3) burglary of a home, (4) auto theft, (5) three armed robberies in the State of Ohio, (6) armed robbery and rape of a 7½-month pregnant woman in her home, and (7) assault of a librarian in an attempted escape.

In *State v. Moore,* 210 Neb. 457, 316 N.W.2d 33 (1982), defendant was charged with two murders of cabdrivers occurring 4 days apart. We upheld the sentencing panel's finding of (1)(a) with regard to the second murder and held that a substantial history of serious assaultive or criminal activity included the first premeditated murder. We also stated that the aggravating circumstances in § 29-2523 were to be given a

narrow construction and application.

In *State v. Jones*, 213 Neb. 1, 328 N.W.2d 166 (1982), we refused to apply (1)(a) where the facts supporting the circumstance had been shown through the defendant's immunized testimony concerning an Iowa murder.

In *State v. Rust*, 223 Neb. 150, 388 N.W.2d 483 (1986), on appeal to this court for postconviction relief, we affirmed our finding of circumstance (1)(a). See *State v. Rust*, 197 Neb. 528, 250 N.W.2d 867 (1977).

In *State v. Joubert*, 224 Neb. 411, 399 N.W.2d 237 (1986), we held that any serious assaultive or terrorizing criminal activity committed by the accused prior to the time of the offense charged may properly be considered in order to determine the applicability of aggravating circumstance (1)(a).

In *State v. Bird Head*, 225 Neb. 822, 408 N.W.2d 309 (1987), the defendant had been convicted of two charges of assault and of an attempted second degree assault prior to his first degree murder conviction. We narrowed our interpretation of (1)(a) further in *Bird Head*:

> The State elected not to adduce any evidence concerning the factual circumstances surrounding the assaults in question. We agree with the sentencing panel's conclusion that there are two aspects to aggravating circumstance (1)(a), one of which may be proved by establishing prior convictions for "another murder or crime involving the use or threat of violence to the person" and the other of which may be proved by showing that the offender "has a substantial history of serious assaultive or terrorizing criminal activity," irrespective of whether the offender was convicted for the conduct creating the history.

*Id*. at 836, 408 N.W.2d at 319.

We must first determine whether the sentencing court correctly applied our interpretation of aggravating circumstance (1)(a).

As noted before, the sentencing judge did not consider the Luke Stice murder in applying this circumstance. The sentencing judge did, however, consider certain other factors which he considered demonstrative of the defendant's history

of "assaultive or terrorizing criminal activity."

In the sentencing judge's written order he stated:

> The evidence submitted to the sentencing court establishes that the defendant did not have, prior to the death of James Thimm, a prior conviction of another murder or a crime involving the use or threat of violence to the person.

> However, the facts surrounding the death of Luke Stice actually predated the death of James Thimm by approximately one month. Although, the first clause of this aggravating circumstance is not applicable, the Court feels that the second clause of the aggravating circumstance is applicable. The Court finds from the evidence that the following facts, which facts are not all inclusive, support the finding beyond a reasonable doubt that Michael W. Ryan had a substantial history of serious assaultive or terrorizing criminal activity:

> a) Michael W. Ryan either spanked and beat Luke Stice, or directed others to do this;

> b) Michael W. Ryan either administered cold showers to Luke and held him under cold water or directed that this be done to Luke;

> c) Michael W. Ryan directed others to sexually abuse Luke Stice;

> d) Michael W. Ryan used Luke Stice as an ashtray;

> e) Michael W. Ryan rolled Luke around in the snow without any clothes on or directed others to do this to Luke;

> f) Michael W. Ryan spit in the mouth of Luke Stice;

> g) Michael W. Ryan shot chickens in the presence of Luke Stice to create in him a fear of guns or directed that this be done to Luke;

> h) Michael W. Ryan terrorized Luke Stice by placing a gun in his mouth and also by shooting him in the arm;

> i) Michael W. Ryan either shoved Luke against the wall on three different occasions or directed others to shove Luke against the wall, which acts ultimately resulted in the death of Luke Stice;

> j) Michael W. Ryan either held Luke off the ground

with a belt around his neck or directed others to do this to Luke;

k) Michael W. Ryan either shot cigarettes himself from Luke's mouth or directed others to do this; and

l) Michael W. Ryan told Luke that he would be castrated, and that he would be placed on a brush pile and burned alive by him.

The evidence further shows that the defendant assaulted both Richard Stice and James Thimm leading up to, and prior to the time of, the events involving the death of James Thimm. These acts would further support the finding that the defendant had a substantial history of serious assaultive or terrorizing criminal acts prior to the death of James Thimm.

Other facts taken from the evidence which would support finding that the defendant had a substantial history of serious assaultive or terrorizing criminal activity are the following:

a) Shortly before Michael W. Ryan left high school, he assaulted a teacher;

b) According to Michael W. Ryan's own testimony, he assaulted a principal at his high school;

c) According to Michael W. Ryan's accounting to Dr. Logan, he was discharged from the military as a result of fighting with six [military police officers].

We note first of all that the defendant's murder of Luke Stice could have been considered by the court in light of our decisions in *State v. Moore*, 210 Neb. 457, 316 N.W.2d 33 (1982), and *State v. Joubert*, 224 Neb. 411, 399 N.W.2d 237 (1986). However, it might have been error for the court to have considered this murder as an aggravating circumstance after having met with members of the Stice family prior to the defendant's sentencing on the James Thimm murder. In this case, the trial court did not consider defendant's plea of nolo contendere and sentence in connection with the murder of Luke Stice as a prior conviction of second degree murder. The court, however, did consider the admitted murder of Luke Stice as evidence of a previous "substantial history of serious assaultive or terrorizing criminal activity."

We feel that the evidentiary facts cited by the sentencing judge rise to the level of "serious assaultive or terrorizing criminal activity," considering that that conduct eventually resulted in the death of Luke Stice. There is sufficient evidence, some of it from defendant, that these events took place, and they are supported beyond a reasonable doubt by the record. We are satisfied that aggravating circumstance (1)(a) was established beyond a reasonable doubt in that the defendant's conduct in causing Luke Stice to be sexually abused, shooting Luke Stice in the arm, hanging Luke Stice by the neck with a belt, shoving Luke Stice against a wall, and shooting cigarettes out of Luke Stice's mouth together all show a "substantial history of serious assaultive or terrorizing criminal activity." Aggravating circumstance (1)(a) was also shown by the defendant's chainings and beatings of both Rick Stice and James Thimm. The record clearly supports a finding of circumstance (1)(a).

We must now determine whether this court's narrow interpretation and application of § 29-2523(1)(a) is unconstitutionally vague or overbroad under *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972). Under the rationale of *Furman*, statutory aggravating circumstances must be clearly defined and applied by a court so as to prevent a sentencing body from exercising discretion that may lead to arbitrary or inconsistent results. The standard laid down in *Furman* is met by our interpretation and application of (1)(a).

Defendant's assignments Nos. 37 and 38 are without merit.

XXIII. *"Circumstance 1(d) is vague and overbroad and thus unconstitutional (Assignments #39 and #40)."*

Section 29-2523(1)(d) is an aggravating circumstance and provides as follows: "The murder was especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence."

In *State v. Rust*, 197 Neb. 528, 538, 250 N.W.2d 867, 874 (1977), we adopted the following statement made by the sentencing panel:

"We recognize that all first degree murder crimes are capable of being accurately characterized by one or more

of the descriptive adjectives employed [in § 29-2523(1)(d)], but by the use of the words 'especially' and 'exceptional' the legislature has required a much greater degree of these characteristics than is usually present in a murder. This category of aggravating circumstances would include murders involving torture, sadism, sexual abuse, or the imposition of extreme suffering. . . ."

Defendant argues that § 29-2523(1)(d) is unconstitutionally vague and overbroad. We have held in *State v. Reeves*, 216 Neb. 206, 344 N.W.2d 433 (1984), that § 29-2523(1)(d) is not unconstitutionally vague. We note that the defendant tortured and sexually abused James Thimm and thus imposed extreme suffering on him. Section 29-2523(1)(d) was properly applied by the sentencing judge.

In *State v. Moore*, 210 Neb. 457, 470, 316 N.W.2d 33, 41 (1982), we held:

Aggravating circumstance (1)(d) of § 29-2523 literally, and as interpreted by this court, describes in the disjunctive two separate circumstances which may operate in conjunction with or independent of one another. The first circumstance is that the murder was especially heinous, atrocious, or cruel. We have said that this circumstance is directed to the "pitiless crime which is unnecessarily torturous to the victim" and to cases where torture, sadism, or the imposition of extreme suffering exists. . . . The second circumstance pertains to the state of mind of the actor. In *State v. Stewart*, [197 Neb. 497, 250 N.W.2d 849 (1977)], we said the second instance indicates a situation "where depravity is apparent to such an extent as to obviously offend all standards of morality and intelligence" (syllabus of the court), and in *State v. Holton*, 197 Neb. 544, 250 N.W.2d 876 (1977), it indicates a state of mind "totally and senselessly bereft of any regard for human life" (syllabus of the court).

In *State v. Joubert*, 224 Neb. 411, 399 N.W.2d 237 (1986), we held that

"exceptional depravity" [as used in § 29-2523(1)(d)] exists when the act is totally and senselessly bereft of any regard

for human life as shown by the presence of the following circumstances, either separately or collectively: (1) apparent relishing of the murder by the killer; (2) infliction of gratuitous violence on the victim; (3) needless mutilation of the victim; (4) senselessness of the crime; or (5) helplessness of the victim. Consequently, where one or more of those five factors are present, there may be a finding of "exceptional depravity."

(Syllabus of the court.)

In *State v. Hunt*, 220 Neb. 707, 725, 371 N.W.2d 708, 721 (1985), we stated:

[F]orcing items into the victim's throat and the strangulation itself were cruel, but not "especially so," for any forcible killing entails some violence toward the victim. There is no evidence the acts were performed for the satisfaction of inflicting either mental or physical pain or that pain existed for any prolonged period of time.

In order for aggravating circumstance (1)(d) to be present, the method of killing must entail something more than the ordinary circumstances which attend any death-dealing violence.

Thus it can be seen that this court has adopted a limiting construction on aggravating circumstance (1)(d), as shown in cases extending from 1977 to 1986. We have held that "especially heinous, atrocious, or cruel" is limited to cases where "torture, sadism, or the imposition of extreme suffering exists," *State v. Moore, supra* at 470, 316 N.W.2d at 41, or where the murder was preceded by acts "performed for the satisfaction of inflicting either mental or physical pain or that pain existed for any prolonged period of time," *State v. Hunt, supra* at 725, 371 N.W.2d at 721.

Similarly we have sharply limited the circumstance of "exceptional depravity" sufficient to constitute an aggravating circumstance to circumstances showing relishing of the murder by the killer, infliction of gratuitous violence on the victim, needless mutilation of the victim, senselessness of the crime, or helplessness of the victim. *State v. Joubert, supra.*

In this case, the sentencing court relied on both parts of § 29-2523(1)(d). The court found facts that showed torture,

sadism, and the inflicting of extreme suffering and the fact that the pain existed for a prolonged period of time. The court also found facts showing that defendant relished the murder, that defendant inflicted gratuitous violence on the victim, that defendant needlessly mutilated the victim, and that the victim was helpless.

The findings of the trial court fit squarely with the statutory definition of § 29-2523(1)(d), as that subsection has been limited by this court's decisions.

The U.S. Supreme Court affirmed the U.S. Court of Appeals for the 10th Circuit in *Maynard v. Cartwright,* 486 U.S. 356, 108 S. Ct. 1853, 100 L. Ed. 2d 372 (1988), holding that "heinous," "atrocious," and "cruel," as used in the Oklahoma murder sentencing statute, were "unconstitutionally vague" under the eighth amendment to the U.S. Constitution.

The court noted, in making that ruling, that the Oklahoma courts had not adopted a limiting construction that cured the infirmity in the Oklahoma statute. See, also, *Lindsey v. Thigpen,* 875 F.2d 1509 (11th Cir. 1989) (The "heinous, atrocious or cruel" aggravating factor in Alabama's death penalty statute had been narrowed to those homicides that are unnecessarily torturous to the victim for purposes of determining whether imposition of the death penalty was unconstitutionally "wanton" or "freakish").

We hold that Nebraska has adopted such a limiting construction as to render the Nebraska statute sound and in full compliance with the U.S. Constitution.

We note also that the trial court, in its order of sentence, set out a list of the Nebraska Supreme Court cases it relied on in entering its order and that some of our cases referred to above are on that list.

In *Furman v. Georgia,* 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), the U.S. Supreme Court held that the death penalty may only be imposed under sentencing procedures that do not create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner. In *Gregg v. Georgia,* 428 U.S. 153, 189, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976), the Court held: "[W]here discretion is afforded a sentencing body on a matter so grave as the determination of

whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."

We agree with the court below that the evidence supported a finding of the existence of the "exceptional depravity" circumstance of (1)(d) in that the defendant apparently relished the murder, inflicted gratuitous violence on the victim, and needlessly mutilated the victim. The defendant had the victim tied and chained, and then repeatedly sodomized the victim with a shovel handle thrust some 2 feet into his body, rupturing his colon and damaging his liver. He also whipped, beat, shot, and skinned him, and then assisted in breaking the victim's legs. The defendant also directed others to inflict extreme suffering on the victim. This evidence alone is sufficient to find the existence of circumstance (1)(d). Section 29-2523(1)(d), as applied, meets the standards set forth by the U.S. Supreme Court and this court.

The balancing of aggravating and mitigating circumstances is not merely a matter of number counting but, rather, requires a careful weighing and examination of the various factors. *State v. Joubert*, 224 Neb. 411, 399 N.W.2d 237 (1986). Additionally, this court's automatic review of capital cases does not require it to set aside a death penalty where certain aggravating factors found to exist below are determined here to be unsupported by the evidence. See Neb. Rev. Stat. § 29-2528 (Reissue 1985). A finding of a single aggravating circumstance on appeal may be sufficient to support a death sentence.

The sentencing court correctly found that sufficient evidence existed to support a finding that both prongs of circumstance (1)(d) existed beyond a reasonable doubt.

Defendant's assignments Nos. 39 and 40 are without merit.

XXIV. *"The state should have the burden at sentencing to prove mitigating circumstances do not exist (Assignment #41)."*

Aside from the fact that the defendant would have the State prove a negative—always a difficult chore—defendant misses the point when he states, "The United States Supreme Court has continually stated that it is impermissible to shift the burden of proof on elements of the crime to the Defendant." Brief for appellant at 88.

We agree with that statement, but suffice it to say that the presence or absence of mitigating factors is not, in any way, an element of the crime of murder. (See the discussion under argument VII above, concerning the burden of proof on the insanity issue.)

Defendant's assignment No. 41 is frivolous.

XXV. *"Refusal of trial court to specifically deal with non-statutory mitigating circumstances (Assignments #42, #43, #44, #45, and #46)."*

The gist of these assignments of error is that the court erred in "failing to deal specifically with the mitigating factors numbered 5 through 16 of defendant's 'Requested Mitigating Factors' . . . ."

We held in *State v. Joubert, supra,* that a defendant may offer any evidence on the issue of mitigation. Prior to the sentencing hearing in this case, defendant requested that the court consider the following "mitigating factors":

5. For 34 years of his life [the defendant] was a law abiding citizen, committed no anti-social acts, and no crimes.

6. It was only after exposure to Jim Wickstrom [sic] teachings that [the defendant's] life changed and anti-social acts were committed.

7. [The defendant] was a very good father and loved by children.

8. [The defendant] had a normal childhood (with exception of beatings by his mother), was well-behaved, attended church, fished and hunted with his father.

9. The disparity of treatment of co-defendants, who did everything defendant did in the matter of the death of James Thimm, compels a life term of imprisonment.

10. Defendant offered to plead guilty to the offenses of second degree murder and kidnapping with harm to the victim (life imprisonment with no minimum term), so that he could have received two life sentences on such pleas; and in addition he offered to plead no contest to a charge of manslaughter insofar as the death of Luke Stice was concerned, all of which could have led to terms of imprisonment of life consecutiive [sic] to life consecutive

to 20 years imprisonment. But such offers of pleas to the county attorney were rejected.

11. Defendant is already serving sentence of life imprisonment and no legitimate interest of the State will be served by imposing the sentence of death.

12. Letter from the Director of Nebraskans Against the Death Penalty.

13. Letter from juror Short.

14. The court extended mercy to co-defendant Tim Haverkamp when it allowed the State to amend its charges to second degree murder, thus making him a witness—although not a truthful one—against defendant, and the Court can extend and should extend mercy to this defendant.

15. Defendant cooperated with the authorities by assisting in the identification of the stolen property on the Rulo farm—most of it stolen by Co-defendants.

16. Dave Andreas does not want defendant to be executed.

The sentencing court considered these factors, as may be seen in the following excerpt from the court's sentencing order:

In addition to the statutory circumstances set forth in Section 29-2523 . . . the terms of Section 29-2521 provide, in part, as follows: "In the proceeding for determination of sentence, evidence may be presented as to any matter that the Court deems relevant to sentence, . . . . Any such evidence which the Court deems to have probative value may be received. . . ."

The court is also aware of the decision of the United States Supreme Court in the case of Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed. 2d 973 (1978), and the direction of [the Nebraska] Supreme Court to apply the rule of that case permitting the introduction of any mitigating evidence offered by the defendant which the Court deems to have probative value, even though such evidence may not specifically come within the scope of the statutory mitigating circumstances. Keeping that direction and guidance in mind, the Court has considered additional mitigating factors [requested by the

defendant].

The trial court clearly considered the mitigating circumstances presented by defendant.

The defendant argues that "Nebraska statutes, Section [sic] 29-2521, 29-2522, and 29-2523 are unconstitutional and void," brief for appellant at 90, since they do not require the sentencing court to make specific findings concerning a defendant's proposed nonstatutory mitigating circumstances. The defendant has not shown that he was prejudiced by the sentencing court's refusal to make specific findings concerning the defendant's proposed mitigating circumstances. The trial court considered the defendant's request. Some of defendant's proposed mitigating circumstances (e.g., Nos. 7 and 8) were not supported by the record. Others (e.g., Nos. 10, 11, and 12) are immaterial. Still others were the same as statutory circumstances.

The sentencing court fairly considered the defendant's proposed mitigating circumstances prior to rendering its decision. The Nebraska capital sentencing procedure fully complies in this regard with the requirements set forth by the U.S. Supreme Court. See, *Sumner v. Shuman*, 483 U.S. 66, 107 S. Ct. 2716, 97 L. Ed. 2d 56 (1987); *Lockett v. Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978).

Defendant's assignments Nos. 42, 43, 44, 45, and 46 are without merit.

XXVI. *"Equally culpable Co-defendants should be sentenced as uniformly as possible to prevent the appearance of impropriety (Assignments #47 and #48)."*

Defendant argues that his sentence was excessive in that "equally culpable co-defendants" were given much less severe sentences. We first note that the only codefendant was Dennis Ryan, who was also convicted.

While it is true that others were involved in James Thimm's murder, the record shows that the defendant was the leader of the group and that the victim was tortured and killed on the defendant's orders. The actions of defendant and the others were not "equally culpable." See, also, *State v. Anderson and Hochstein*, 207 Neb. 51, 296 N.W.2d 440 (1980) (where only two of the three coperpetrators were charged with first degree

murder).

Defendant also argues that the "only reason which could account for this extreme disparity in sentence is that Michael W. Ryan had a lengthy and expensive trial and the Co-defendants plead [sic] guilty . . . ." Brief for appellant at 92. Defendant's assertion is unwarranted, unsupported by law or logic, and without merit. The record shows that James Thimm would not have suffered death absent the defendant's leadership.

Defendant's assignments Nos. 47 and 48 are without merit.

XXVII. *"Defendant's sentence was excessive (Assignments #49, #50, #51, and #52)."*

The defendant argues that his sentence was excessive. It is hard for this court to conceive of a more senseless and brutal murder. We have reviewed all criminal homicide cases pursuant to Neb. Rev. Stat. §§ 29-2521.01 et seq. (Reissue 1985) and find that the defendant's death sentence is justified when compared to all other homicide cases. *State v. Palmer*, 224 Neb. 282, 399 N.W.2d 706 (1986).

XXVIII. *"The trial court erred in denying Defendant's showing to Court in addition to Defendant's motion to exclude death penalty, motion to exclude the death penalty, and specific objections to imposition of death penalty (Assignments #53, #54, #55, #56, #57, and #58)."*

In defendant's 60 assignments of error, the defendant has assigned the above-numbered six general statements, contending the trial court erred in its failure to review the motions made by the defendant in the court below, including defendant's motion to exclude the death penalty, defendant's additional motion to exclude the death penalty, and defendant's specific objections to imposition of the death penalty. The sum and substance of these general statements is contained in various other assignments of error and have been discussed above. We have reviewed these motions and the arguments made in support thereof, and conclude that the trial court's decisions denying these motions were not an abuse of discretion. These assignments are without merit.

XXIX. *"Cumulative effect of errors at guilt-innocence and life-death portions of trial deprived Defendant of a fair trial (Assignment #59)."*

In the defendant's 59th assignment of error the defendant contends that the combined effect of the errors assigned rendered the proceedings against him fundamentally unfair. He makes no real argument, nor does he cite any cases, to support such assertion. It is without merit.

Of more controlling effect is the doctrine of harmless error.

We held in *State v. Watkins*, 227 Neb. 677, 686, 419 N.W.2d 660, 666 (1988): "Harmless error exists in a jury trial of a criminal case when there is some incorrect conduct by the trial court which, on review of the entire record, did not materially influence the jury in a verdict adverse to a substantial right of the defendant." This comports to the rule found in *Chapman v. California*, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), wherein the U.S. Supreme Court stated:

All of these [harmless error] rules, state or federal, serve a very useful purpose insofar as they block setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial. We conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction.

The Court in *Chapman* further held that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.

In *Rose v. Clark*, 478 U.S. 570, 576, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986), the U.S. Supreme Court stated:

In *Chapman v. California*, 386 U.S. 18 (1967), this Court rejected the argument that errors of constitutional dimension necessarily require reversal of criminal convictions. And since *Chapman*, "we have repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt."

In view of all of the evidence before the jury, we conclude

that the combined effect of the errors defendant alleged occurred at trial was harmless beyond a reasonable doubt and that the defendant was not prejudiced by these alleged errors. This conclusion is supported by the overwhelming evidence against the defendant, including the defendant's own testimony as to his part in the murder of James Thimm. The cumulative effect of these alleged errors did not have a material effect on the jury in reaching its verdict. A defendant is not constitutionally entitled to receive a perfect trial, only a fair and constitutional trial. *State v. Hochstein*, 216 Neb. 515, 344 N.W.2d 469 (1984).

XXX. "*The Nebraska Supreme Court should not limit brief size in a capital case (Assignment #60)*."

Defendant has a fundamental problem with the meaning of the word "brief." The defendant filed a motion requesting leave to file a 191-page brief with this court. This motion was denied, and the defendant was allowed to file a 100-page brief with 60 assignments of error. The defendant's case has been argued zealously in all stages of the proceedings. We also note that the Attorney General only addressed 15 of the 60 assignments made by the defendant. The defendant cannot predicate error on this court's denial of his motion requesting leave to file a 191-page brief.

As stated before, this court is charged with the automatic review of all cases in which the death penalty has been imposed. § 29-2525. This court has separately reviewed each of defendant's assignments of error. The decision of the Richardson County District Court is affirmed.

AFFIRMED.